Jimmie Lee TUCKER et al., Plaintiffs,

v.

The CITY OF MONTGOMERY BOARD OF COMMISSIONERS et al., Defendants.

Civ. A. No. 74–221–N.

United States District Court, M. D. Alabama, N. D.

March 16, 1976.

16. Brief, page 8.

17. See MSA 27A.7585, prohibiting discharge because of garnishment.

498

Howard A. Mandell and Joseph J. Levin, Jr., Montgomery, Ala., for plaintiffs.

Walter J. Knabe, Capell, Howard, Knabe & Cobbs, and Joseph D. Phelps, Robison, Belser, Brewer & Phelps, Montgomery, Ala., for defendants The City of Montgomery Bd. of Commissioners, Jim Robinson, Matthis Piel, and Curtis Springer.

William J. Baxley, Atty. Gen., Myron H. Thompson and Charles N. Parnell, Asst. Attys. Gen., and Tony Davis, Asst. Atty. Gen., State of Alabama, Montgomery, Ala., for defendant William Baxley.

Calvin M. Whitesell, Whitesell & Gordon, Montgomery, Ala., for defendant Robert Strickland.

OPINION

Before GODBOLD, Circuit Judge, and JOHNSON and VARNER, District Judges.

GODBOLD, Circuit Judge:

This class action concerns the constitutionality of several practices claimed to prevail in the Municipal Court of Montgomery, Alabama, and the constitutionality of Alabama statutes that relate to those practices.

These are the alleged practices in question: (1) requiring a convicted defendant to furnish a surety bond in order to appeal his conviction; (2) payment of fees to the Presiding Judge of the Municipal Court in various cases where he has found the defendant guilty or has bound him over to the county grand jury; (3) practices relating to furnishing counsel to indigent defendants who desire counsel; and (4) requiring that an indigent defendant who is sentenced to a fine and costs which are not paid be held in confinement in lieu of the payment.

The Montgomery Municipal Court performs the functions referred to in the state statutes as those of a recorder's court and the judges are at times referred to as recorders. See Tit. 37, § 582 et seq., Code of Ala. (1958 Recompilation).[1] It has original jurisdiction of cases charging violations of ordinances of the City of Montgomery. It has con-

1. Except where otherwise indicated, all references to the Code are to this edition.

current jurisdiction with state courts of all state misdemeanors committed within the city. Tit. 37, § 594. It conducts preliminary hearings in state felony cases. Tit. 37, §§ 585, 596.

## I. The parties

The plaintiffs are five alleged indigents who have been convicted in the Municipal Court and claim to have been adversely affected by one or more of the practices in question. The defendants remaining in the case are The City of Montgomery Board of Commissioners (now The Montgomery City Council); William Baxley, as Attorney General of the State of Alabama; Jim Robinson, individually and as Mayor of the City of Montgomery; Matthis Piel, individually and as Recorder of the City of Montgomery; Curtis Springer, individually and as Assistant Recorder of the City of Montgomery; and Robert Strickland, individually and as Warden of the Montgomery City Jail.

In connection with their prayer for statewide relief on the appeal bond and fee payment claims, plaintiffs designate Mayor Robinson and the Recorder, Judge Piel, as representatives of two defendant classes comprising mayors and recorders throughout the state. Defendants object to inclusion of these classes and assert that the practices of municipal courts throughout the state vary substantially from one locality to another, some such courts having been established pursuant to local acts, general acts of local application, and local ordinances.

Plaintiffs have the burden of convincing the court that the named representatives of a defendant class satisfy Rule 23, Fed.R.Civ.P. See Wright & Miller, Federal Practice & Procedure: Civil, § 1770 at 658–661. Lack of statewide uniformity in municipal courts, though a relevant indicator of the com-

monality of law and fact questions, is not dispositive.[2] Plaintiffs challenge the constitutional validity of state statutes on their face and as applied. These statutes govern appellate procedure and allocation of court costs and fees in all recorder's courts in Alabama, regardless of whether established by local ordinances or state legislative acts. Other state statutes establish uniform powers and duties of recorders. It may be that municipal court policies and practices in Alabama vary depending on statutory interpretations and applications, but these variations are inevitable. As long as statutes of general application authorize challenged acts, a showing that every recorder enforces those statutes is not indispensable to a conclusion that common questions of law and fact exist in a class of recorders. Accordingly, we find that the Recorder of the Montgomery Municipal Court may be designated as representative of a class of recorders in other Alabama municipalities.

We are not persuaded, however, that the Mayor of the City of Montgomery shares with his counterparts in Alabama a sufficient commonality in the context of the issues raised to give him the status of a class representative. Liability of a mayor for unconstitutional practices in a municipal court assumes some supervisory authority or responsibility over that area of municipal affairs, but in Alabama the existence and extent of that authority may vary with the form of city government and may be governed by statutes of local application and by local ordinances. We therefore hold that this suit cannot be maintained against Mayor Robinson as representative of the class of Alabama mayors.

## II. Jurisdiction

Plaintiffs state complaints cognizable under the Fifth, Sixth, Seventh, Eighth,

---

2. *See Washington v. Lee,* 263 F.Supp. 327 (three-judge court, M.D.Ala.1966), *aff'd per curiam,* 390 U.S. 333, 88 S.Ct. 994, 19 L.Ed.2d 1212 (1968) (county sheriff and city warden properly sued as representatives of their counterparts in class action to enjoin racial segregation in state penal system and in county, city, and town jails). *See also Rakes v. Coleman,* 318 F.Supp. 181 (E.D.Va.1970) (state circuit judge properly sued as representative of class of counterparts empowered to commit alcoholics for treatment and rehabilitation pursuant to state statute challenged as unconstitutional).

Ninth, and Fourteenth Amendments to the Constitution and under 42 U.S.C. § 1983.[3] They invoke this court's jurisdiction pursuant to 28 U.S.C. §§ 1331, 1343(3) and (4). Plaintiffs have not established the requisite amount in controversy for § 1331 federal question jurisdiction, so they stand or fall on § 1983 and its jurisdictional counterpart.

■ Plaintiffs seek injunctions against the enforcement of state statutes challenged on federal constitutional grounds. This requires a three-judge court, 28 U.S.C. §§ 2281 and 2284. We do not separately discuss three-judge jurisdiction with respect to all the claims made in the case. Some would independently support convening of a three-judge court, others would not. A three-judge court having been properly convened, we have discretion to consider the non-three-judge issues, and we do so.

### III. Requiring a bond to appeal

#### (a) Standing and case or controversy; the plaintiff class.

Tit. 37, § 587[4] provides that one convicted in the municipal court and wishing to appeal to the state circuit court may do so "by giving bond with good and sufficient sureties." The constitutionality of this statute, and of the Municipal Court's method of applying it, is questioned by plaintiffs Jimmy Lee Tucker, Jerome Wright and Yancey Banks. We hold that a case or controversy exists with respect to each of these plaintiffs, that each has standing to prosecute the claim which he asserts, and that under Rule 23, Fed.R.Civ.P. each properly represents a class.

■ Tucker was convicted in the Municipal Court on April 11, 1974, on charges of leaving the scene of an accident (sentence of six months), driving without a license (sentence of 45 days), and failing to yield the right of way (fine of $22.50). He desired to appeal to the Circuit Court of Montgomery County, but lacked the necessary money to make the bond required by § 587. The record supports Tucker's contention that defendant Judge Springer responded to his request for an appeal with only a single inquiry regarding his financial means. This suit was filed July 10, 1974, at which time Tucker was still in jail. Thus at that time a live, sharp controversy was involved, and Tucker had standing to present it.[5] We find that he is the proper representative of a class composed of indigent persons who are convicted in the Montgomery Municipal Court, or in the various other municipal or recorder's courts in Alabama, from which convictions they wish to appeal but are unable to do so because of their financial inability to comply with § 587.

3. 42 U.S.C. § 1983. Civil action for deprivation of rights:

· "Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress."

4. In pertinent part § 587 provides:

"Appeal from recorder's court.—In any case involving the validity of an ordinance of the city, tried before the recorder, the council may take an appeal, without bond, to the circuit court or court of like jurisdiction; and in any case the defendant may take an appeal to such court by giving bond with good and sufficient sureties, payable to the city, to be approved by the recorder or officer trying the case, or should such recorder or officer trying the case be prevented, by absence from the city, death or other disability, from approving such bond, such bond may be approved by the city clerk, conditioned to be void if the defendant appears before said court, until discharged by law to answer said charge, but unless such bond be given within five days from the date of the judgment, no appeal shall be allowed from such judgment. An appeal bond for more than three hundred dollars shall in no case be required, but when sitting as a committing magistrate, any reasonable bond may be required."

5. Tucker also had standing based on the "capable of repetition, yet evading review" basis, discussed below with respect to Wright and Banks.

*Preiser v. Rodriquez,* 411 U.S. 475, 93 S.Ct. 1827, 36 L.Ed.2d 439 (1973), requires that a prisoner who desires to attack by a federal suit the fact or duration of his confinement must proceed by habeas corpus after having exhausted state remedies. That case does not, however, bar Tucker from proceeding under 42 U.S.C. § 1983, because he also sought damages. *Wolff v. McDonnell,* 418 U.S. 539, 94 S.Ct. 2963, 41 L.Ed.2d 935 (1974). Even if Tucker's suit is viewed as more in the nature of a habeas corpus claim, his status as class representative permits him to proceed under § 1983 on behalf of the class. *Leonard v. Mississippi State Probation and Parole Board,* 509 F.2d 820 (CA5, 1975).

Soon after this suit was filed Judge Varner, acting as a single judge, treated Tucker's application for emergency relief as an application for a writ of habeas corpus and granted the writ, which resulted in Tucker's release. This did not moot the case insofar as the class action was concerned. *Sosna v. Iowa,* 419 U.S. 393, 95 S.Ct. 553, 42 L.Ed.2d 532 (1975).

At this point we also analyze the standing of Wright and Banks in order to avoid repetitive discussion of jurisdictional matters in subsequent parts of this opinion.

Wright, a party in this suit as originally filed, and Banks, added April 18, 1975, were sentenced by defendant Piel on August 2, 1974, to five days in jail for fighting. Each sought to appeal but was financially unable to comply with § 587.[6] Each completed his sentence.

These two plaintiffs make substantial constitutional attacks on the appeal bond requirement of § 587 and the practices of the Municipal Court in enforcing that requirement. They have been subjected to and adversely affected by the statute and the practices. Unlike the plaintiffs in *O'Shea v. Littleton,* 414 U.S. 488, 94 S.Ct. 669, 38 L.Ed.2d 674 (1974), and *Gardner v. Luckey,* 500 F.2d 712 (CA5, 1974), Wright and Banks have each "identified himself as having suffered an injury in the manner specified." 414 U.S. at 495, 94 S.Ct. at 676, 38 L.Ed.2d at 683; 500 F.2d at 714. In contrast to the general and vague claims of appellants in *Gardner,* 500 F.2d at 713, the claims of Wright and Banks are precise and defined.[7] Moreover, they reflect a sound basis for equitable relief not apparent in *O'Shea* or *Gardner.* The *Gardner* court emphasized that the relief sought necessarily would create substantial *Younger v. Harris,* 401 U.S. 37, 91 S.Ct. 746, 27 L.Ed.2d 669 (1971), problems and would be difficult if not impossible to monitor and enforce, requiring "exactly the sort of intrusive and unworkable supervision of state judicial processes condemned in *O'Shea.*" 500 F.2d at 715. In the present case the relief sought will have little or no effect on pending state prosecutions, will not violate the principles of federalism, and will not be cumbersome or awkward to enforce. See *Gerstein v. Pugh,* 420 U.S. 103, 95 S.Ct. 854, 43 L.Ed.2d 54 (1975); *Conover v. Montemuro,* 477 F.2d 1073 (CA3, 1973) (en banc).

Because most jail sentences given to defendants in recorder's courts are of a relatively short duration, these claims are also "capable of repetition, yet evading review." *Southern Pac. Terminal Co. v. ICC,* 219 U.S. 498, 515, 31 S.Ct. 279, 283, 55 L.Ed. 310, 316 (1911). In view of this circumstance we are inclined to take a practical rather than rigid approach to the case or controversy determination, weighing such factors as the likelihood of other persons being subjected to or affected by the challenged action and the substantiality of the consti-

---

**6.** Plaintiffs Wright and Banks were instructed by the Clerk's office that an appeal required either the posting of a $300 cash bond, a surety bond signed by two property owners, or a corporate surety bond. Testimony by the court's Chief Clerk confirmed authorization for these instructions.

**7.** In *O'Shea,* the Supreme Court, in finding no case or controversy, emphasized that "important to this assessment is the absence of allegations that any relevant criminal statute . . . is unconstitutional on its face or as applied . . . ." 414 U.S. at 496, 94 S.Ct. at 676, 38 L.Ed.2d at 683.

tutional claim. See *Roe v. Wade*, 410 U.S. 113, 125, 93 S.Ct. 705, 713, 35 L.Ed.2d 147, 161 (1973); *Doe v. Bolton*, 410 U.S. 179, 187, 93 S.Ct. 739, 757, 35 L.Ed.2d 201, 210 (1973). We find instructive the Supreme Court's recent discussion of this issue, with reference to pre-trial detention, in *Gerstein v. Pugh, supra.*

> Pretrial detention is by nature temporary, and it is most unlikely that any given individual could have his constitutional claim decided on appeal before he is either released or convicted. The individual could nonetheless suffer repeated deprivation, and it is certain that other persons similarly situated will be detained under the allegedly unconstitutional procedures. The claim, in short, is one that is distinctly "capable of repetition, yet evading review."

420 U.S. at 110, 95 S.Ct. at 861 n.11, 43 L.Ed.2d at 63 n.11. See also *Jones v. Diamond*, 519 F.2d 1090, 1093 n.1 (CA5, 1975). Since the instant case is a class action, the "capable of repetition, yet evading review" analysis applies without regard to whether there is a reasonable expectation that the named complainants will be subjected to the same action again. See *Sosna v. Iowa, supra; Weinstein, et al. v. Bradford*, 423 U.S. 147, 96 S.Ct. 347, 46 L.Ed.2d 350, 44 U.S.L.W. 3372 (1975, per curiam).

Thus we conclude that a case or controversy exists with respect to the claim Wright and Banks assert, and they have standing to assert the issues which they raise. We find that they are proper representatives of the same class represented by Tucker.

### (b) Constitutionality of § 587, facially and as applied.

■ On its face § 587 does not contravene the equal protection clause of the Fourteenth Amendment. It does not carve out a discriminatory classification based on economic means. All defendants convicted in municipal courts must meet the conditions imposed for taking an appeal to the state circuit courts. Under the traditional equal protection analysis, the appeal bond bears a rational relationship to the state's interest in assuring the appearance of litigants in an appellate forum it chooses to provide. See *Rinaldi v. Yeager*, 384 U.S. 305, 86 S.Ct. 1497, 16 L.Ed.2d 577 (1966).

■ As applied to Tucker, Wright and Banks, and the members of the class that they represent, that portion of § 587 which conditions a defendant's exercise of the statutory right of appeal upon posting of a bond with good and sufficient sureties violates the equal protection clause.[8] While a state may not constitutionally be required to provide appellate review, see *Ross v. Moffit*, 417 U.S. 600, 94 S.Ct. 2437, 41 L.Ed.2d 341 (1974), "once the State chooses to establish appellate review in criminal cases, it may not foreclose indigents from access to any phase of that procedure because of their poverty." *Burns v. Ohio*, 360 U.S. 252, 257, 79 S.Ct. 1164, 1168, 3 L.Ed.2d 1209, 1213 (1959) (filing fee required for discretionary appeal to state supreme court). Stated somewhat more strongly, "[t]he imposition by the State of financial barriers restricting the availability of appellate review for indigent criminal defendants has no place in our heritage of Equal Justice Under Law." *Id.* at 258, 79 S.Ct. at 1169, 3 L.Ed.2d at 1213; *Smith v. Bennett*, 365 U.S. 708, 710, 81 S.Ct. 895, 896, 6 L.Ed.2d 39, 42 (1961); see *Griffin v. Illinois*, 351 U.S. 12, 76 S.Ct. 585, 100 L.Ed. 891 (1956). The fact that municipal ordinances are considered "quasi-criminal" is of no importance. "The availability of a procedure to regain liberty lost through crimi-

---

8. We specifically reject the holding by a single district judge of the Northern District of Alabama in *Madden v. Griffin*, 386 F.Supp. 529 (N.D.Ala.1975), that § 587 can be construed to mean that the individual personal recognizance of the defendant meets the requirements of a "bond" and of "good and sufficient sure-

ties," and that § 587 as thus narrowly construed, is constitutional. We note that the Alabama Supreme Court has not placed a limiting construction on § 587 to preclude the constitutional challenge. Indeed, the pertinent opinions of that court appear to uphold the statute against equal protection attacks.

nal process cannot be made contingent upon a choice of labels." See *Smith v. Bennett, supra*, 365 U.S. at 712, 81 S.Ct. at 898, 6 L.Ed.2d at 42.[9]

We find that there is a policy and practice in the Montgomery Municipal Court of enforcing § 587 in a manner which violates the constitutional rights of indigents. The argument of some of the defendants that no such practice exists is either disingenuous or an effort to mislead this court which cannot be countenanced. Section 587 requires the practice. The evidence establishes the existence of the practice.

### (c) Injunctive relief.

■ Mayor Robinson, Judge Piel and Judge Springer must be enjoined from applying or permitting the application of Tit. 37, § 587 to indigents in any manner which, because of their lack of financial ability, precludes them from exercising their statutory right to appeal.[10] The record does not contain an evidentiary basis for injunctive relief against municipal courts throughout the state.

### IV. Payment of fees to the Presiding Judge

Fees have been paid to Presiding Judge Piel in various cases where he has found the defendant guilty or has bound him over to the county grand jury. Payments by the Clerk of the Circuit Court

of Montgomery County began in October 1973, the month Piel was appointed Municipal Judge, and continued through June 1974,[11] as follows:

Judge Piel receives from the City a salary of $14,000 per year and from the County a salary of $5,100 per year (for his services as committing magistrate in felony cases). Thus for the period October 1973-June 1974 the fees received by him represented 21.7% of his total compensation for serving as Municipal Judge.

The undisputed evidence is that Judge Springer, who substitutes for Judge Piel during the latter's infrequent absences, has not received fees.

The judges of the Municipal Court sit as committing magistrates in state felony cases. A person accused of a felony will be brought before a judge who determines by a preliminary hearing whether there is probable cause to order him held so that the county grand jury can consider the charges against him. If the committing magistrate finds there is not probable cause, he orders the accused released.

If a committing magistrate on preliminary hearing binds over to the grand jury a defendant charged with a felony and the defendant is later convicted and sentenced to the penitentiary or to hard labor, the effect of Tit. 45, § 69 and Tit. 11, § 84[12] is to authorize payment of a

9. Plaintiffs also claim that the appeal bond provision deprives them of access to jury trial and thus of due process. A trial in municipal court is before the judge alone, and it is only by appeal to the circuit court, with a bond, where proceedings are de novo, that one can secure a trial by jury. We need not decide this claim.

10. As to the Mayor's amenability to injunctive restraint in light of the Supreme Court's recent decision in *Rizzo v. Goode*, 423 U.S. 362, 96 S.Ct. 598, 46 L.Ed.2d 561, 44 U.S.L.W. 4095 (1976), *see* Part V of this opinion at p. 506.

11. Fees are still being taxed as part of Circuit Court costs but are not being paid to Judge Piel. After this suit was filed District Attorney James H. Evans instructed the Clerk of the Circuit Court to place all such fees in an

escrow account pending judicial resolution of the constitutional issue raised in this litigation.

| 1973 | |
|---|---|
| October | $ 9.00 |
| November | 141.00 |
| December | 55.50 |
| 1974 | |
| January | 1,156.00 |
| February | 115.00 |
| March | 433.00 |
| April | 237.50 |
| May | 608.50 |
| June | 349.50 |
| Total | $3,105.00 |

12. In pertinent part Tit. 11, § 84 provides:
"Whenever a defendant is convicted and sentenced to the penitentiary, or to hard labor, the costs of the committing magistrate

fee to the committing magistrate out of the costs taxed and paid in the case in the circuit court. If the sentence is suspended the state pays the costs, and out of the costs $5 is paid to the committing magistrate. Tit. 45, § 69. If the sentence is not suspended the defendant is taxed with costs, and if they are paid the committing magistrate receives a fee of $10 out of the costs. Tit. 11, § 84.

### (a) Standing and case or controversy; the plaintiff class.

Plaintiff Marvin Thornton was bound over to the grand jury by Judge Piel in November 1973, following a preliminary hearing, on a felony charge of possession of marijuana. Later Thornton pleaded guilty to that charge in Circuit Court and was given a two-year suspended penitentiary sentence and placed on supervised probation for two years. The state paid the costs and out of them a fee of $5 was paid to Judge Piel pursuant to § 69.[13]

Plaintiff Richard Gunter was convicted by Judge Piel on November 30, 1973, of two counts of assault and battery (a state misdemeanor) and one count of disorderly conduct (violation of a municipal ordinance). He was sentenced to 18 months in the county jail on the state charges and six months in the city jail on the disorderly conduct charge and fined a total of $700 plus costs. He appealed to the Circuit Court and there pleaded guilty to all three cases and was sentenced to a $100 fine and costs in each case. Out of the court costs paid by him in the state case $10 was paid to Judge Piel.[14]

■ For the reasons discussed in Part III with respect to plaintiffs Wright and Banks, plaintiffs Thornton and Gunter have standing to raise the issue of payment of fees to Judge Piel and there is a viable case or controversy. Neither seeks reversal of his conviction, and no money damages are claimed. In our view, *O'Shea* does not establish a hard and fast rule automatically denying federal injunctive and declaratory relief in class suits where the representative's standing is supplied by past exposure to the challenged conduct. The circumstances supporting denial of equitable relief in that case also suggest the limits of its holding. We need not repeat our analysis on this point,[15] but emphasize

---

and constable on preliminary trial, both together, not to exceed ten dollars . . . shall be taxed in the bill of costs in the same manner, and paid out of the same fund, at the same time, and in the same way, as is provided by law *for the payment of* other items of costs incurred by the state; . . . "

The relevant language of Tit. 45, § 69 is:

" . . . In addition to the fees for the clerks payable out of the convict fund, the following shall also be paid from such fund whenever a defendant is convicted and sentenced to the penitentiary: . . . cost of committing magistrate and constables on preliminary trial, including preliminary trials before a recorder as committing magistrate in the recorder's court of a city or town, both together not to exceed five dollars . . . "

**13.** There is some evidence that even when a felony charge is *nolle prosequi* in Circuit Court Judge Piel is paid a fee. We cannot locate statutory authorization for this.

**14.** The statutory authority, if any, for this payment is unclear. Tit. 45, § 69 and Tit. 11, § 84, relate to the fee paid when a defendant is bound over and later convicted in Circuit Court of a *felony.* Gunter was *convicted* by Judge Piel of a misdemeanor. *See* Tit. 37, § 585; Tit. 11, §§ 96–97.

**15.** *Contrast* the Eighth Circuit's recent reliance on *O'Shea* to dismiss a § 1983 action for declaratory and injunctive relief in *Bonner v. Circuit Court of the City of St. Louis, Missouri,* 530 F.2d 827, 44 U.S.L.W. 2279 (CA8, 1975). Plaintiffs, 20 black prisoners who had been convicted in the circuit court, alleged that several judges, the chief prosecutor, and the public defender had joined in a systematic racially discriminatory conspiracy to deny equal protection to black citizens by coercing pleas of guilty to criminal charges. Citing principles of equity and comity, the en banc court affirmed dismissal of the complaint because it failed to allege irreparable harm and lack of an adequate remedy at law, and because the doctrine of federal nonintervention into state court proceedings applied. The ultimate relief sought—a declaration of racial discrimination in the state criminal system—would require a federal evidentiary hearing for all black defendants detained pending trial in the City of St. Louis.

that Gunter and Thornton have suffered from governmental action which goes to the heart of the integrity of our judicial process and casts doubt on its vaunted premise of equal justice under the law. The governmental conduct came within the purview of a legislative act. That does not legitimize the unconstitutional wrong. Continued application of these statutes in municipal courts throughout Alabama jeopardizes the constitutional right of countless criminal defendants to appear before impartial tribunals. Moreover, possible ignorance of the statutory scheme at the time of a defendant's court appearance would make inadequate any legal means available to him to disqualify a financially interested judge. Possible mootness of individual claims may cause this significant challenge to elude judicial review.

We find that Thornton properly represents a class of persons throughout the State of Alabama who are convicted in circuit courts following bind-overs by judges of municipal courts who receive fees out of court costs for their services as committing magistrates. Gunter properly represents a class of persons who are convicted in municipal courts of state misdemeanors by judges who are paid fees out of court costs upon conviction de novo on appeal to state circuit courts.

(b) Constitutionality of the statutes, and of court practices.

 Insofar as Tit. 45, § 69, and Tit. 11, § 84, authorize payment to a judge of a municipal court, sitting as committing magistrate, of costs or fees in the cases of defendants bound over by him to the county grand jury on felony charges and in a circuit court convicted and sentenced, they are unconstitutional. Insofar as a municipal court implements §§ 69 and 84 by its practices, these practices are unconstitutional. Practices of a municipal court, whether or not specifically authorized by law, under which a judge thereof is paid any fee upon a defendant's conviction and subsequent appeal and conviction in a circuit court, are unconstitutional practices.

Financial interest of the judge in the conviction of the defendant appearing before him has been recognized as a violation of due process since *Tumey v. Ohio,* 273 U.S. 510, 47 S.Ct. 437, 71 L.Ed. 749 (1927). In *Tumey* the judge was the mayor. The Supreme Court said:

> There are doubtless mayors who would not allow such a consideration as $12.00 costs in each case to affect their judgment in it; but the requirement of due process of law in judicial procedure is not satisfied by the argument that men of the highest honor and the greatest self-sacrifice could carry it on without danger of injustice. Every procedure which would offer a possible temptation to the average man as a judge to forget the burden of proof required to convict the defendant, or which might lead him not to hold the balance nice, clear, and true between the State and the accused, denies the latter due process of law.

*Id.* at 532, 47 S.Ct. at 444, 71 L.Ed. at 758. In a series of cases federal courts have held unconstitutional fees paid to justices of the peace in Alabama contingent upon conviction of the defendant. *Hulett v. Julian,* 250 F.Supp. 208 (M.D. Ala.1966) (3-judge court); *Bennett v. Cottingham,* 290 F.Supp. 759 (N.D.Ala. 1968) (3-judge court), aff'd, 393 U.S. 317; 89 S.Ct. 554, 21 L.Ed.2d 513 (1969). See also *Callahan v. Sanders,* 339 F.Supp. 814 (M.D.Ala.1971), aff'd in part, rev'd in part, sub nom. *Callahan v. Wallace,* 466 F.2d 59 (CA5, 1972).

It appears that in some instances Judge Piel has been paid fees in cases where he has passed on guilt or innocence and where there has been an appeal and a second conviction in the Circuit Court. Plainly this is unconstitutional. To the extent that Judge Piel has been paid fees in cases where, as committing magistrate, he has passed on probable cause, and there has been grand jury action followed by conviction and sentence, we see no distinguishing

difference. The financial reward is less direct, but the principle is no different. The preliminary hearing is a "critical stage" of the state's criminal process for purposes of the right to counsel. *Coleman v. Alabama*, 399 U.S. 1, 10, 90 S.Ct. 1999, 2003, 26 L.Ed.2d 387, 397 (1970). The accused is as entitled at preliminary hearing to an impartial decisionmaker as in a guilt trial. The decision of probable cause is the trigger for the ensuing scheme of grand jury consideration, indictment and conviction. After the preliminary hearing stage the person bound over may cease to be a target—the grand jury may not indict, and if it does the trial may not produce conviction—but the preliminary hearing sets in motion the machinery that may ultimately grind to conviction. As the Supreme Court pointed out in *Ward v. Village of Monroeville*, 409 U.S. 57, 93 S.Ct. 80, 34 L.Ed.2d 267 (1972),

> Nor, in any event, may the State's trial court procedure be deemed constitutionally acceptable simply because the State eventually offers a defendant an impartial adjudication. Petitioner is entitled to a neutral and detached judge in the first instance.

*Id.* at 61, 93 S.Ct. at 84, 34 L.Ed.2d at 272; see *Hulett v. Julian, supra,* at 209–210. Petitioner in *Ward* was tried before a mayor authorized to sit as judge in cases of ordinance violations and traffic offenses. A major part of village revenues derived from the fines, forfeitures, costs, and fees imposed by the mayor in this capacity. Unlike the Presiding Judge of the Montgomery Municipal Court, the mayor did not share directly in the fees and costs generated by his judicial rulings. The village income, however, was substantially affected, and the Court found that the mayor's executive responsibilities for revenue production provided the temptation for partisan judgments contravening the principles of *Tumey.* See also *Hugall v. Baxter,* Civil No. 74–67–S (M.D.Ala., Mar. 3, 1976), in which a three-judge court applied the *Ward* and *Tumey* principles to declare unconstitutional the conduct of judicial

proceedings by an Alabama mayor, sitting ex-officio as recorder pursuant to state statute. When, as here, the decision-maker stands to gain direct financial remuneration from a determination to bind a felony defendant to the grand jury, or to find a misdemeanant guilty, the *Tumey* principles apply with even greater force.

#### (c) Injunctive relief.

As already pointed out, after this suit was filed payment of fees to Judge Piel was stopped and pending decision of this case fees like those formerly paid to him have been held in escrow by the Clerk of the Circuit Court of Montgomery County. *See* note 11 *supra.* An injunction must be issued forbidding Judge Piel from collecting or receiving in the future fees such as hereinabove described and from collecting or receiving any of the fees presently held in escrow. The record does not contain sufficient evidence of practices in other municipal courts to justify injunctive relief with respect to them.

### V. Furnishing legal counsel to indigents

#### (a) Standing and case or controversy; the plaintiff class.

This claim involves the issue of whether the procedures employed in the Montgomery Municipal Court for furnishing counsel to indigent defendants are effective as required by *Argersinger v. Hamlin,* 407 U.S. 25, 92 S.Ct. 2006, 32 L.Ed.2d 530 (1972). The claim is asserted by plaintiffs Tucker and Wright, and we hold that they are representatives of a class of indigent defendants who have cases in Montgomery Municipal Court for which they desire but are not furnished appointed counsel because none are promptly available.

Tucker was indigent and desired counsel for his first appearance in Municipal Court on April 11, 1974. Defendants deny knowledge of any requests for counsel Tucker allegedly made, but this factual dispute misses the point. It is

undisputed that Tucker was not offered or provided court-appointed counsel. As already pointed out, Tucker was in jail when this suit was filed. We have also previously noted that neither the case or controversy nor Tucker's standing in this class action was terminated by the grant of his habeas corpus writ.

■ Plaintiff Wright, also an indigent, claims direct harm from the challenged Municipal Court practices based on two occasions when he was not furnished counsel. He was convicted in December 1973 on various traffic offenses and sentenced by Judge Springer to three weekends in jail. In May 1974 he was charged with and subsequently convicted of escape from the city jail, where he was being detained on an unrelated matter. He requested counsel at his appearance for trial on Monday, June 24. No counsel was provided, and Wright remained in custody while his case was continued by Judge Piel four days. As evidenced by the recollection of the court's Chief Clerk, the continuance was occasioned by the absence of public defenders in Municipal Court on the scheduled trial date.[16] Like Wright, many indigent and uncounseled misdemeanants in the represented class will complete their short-term sentences without a reasonable opportunity to challenge the validity of their convictions. Equitable relief remains a live issue for this class.

### (b) The practices of the Municipal Court.

Shortly after the Supreme Court's decision in *Argersinger v. Hamlin* the then judge of the Municipal Court, Judge James Evans, notified the defendant Mayor Jim Robinson of the need to develop a public defender program for the Municipal Court. A single attorney was employed to serve five days a week and was expected to be present whenever court was in session. He served from July 1972 through January 1974. He resigned and soon thereafter was replaced by two public defenders who serve only on Thursdays and Fridays. Theoretically they are on call on Mondays, Tuesdays and Wednesdays,[17] but a few times when they have not been available the office of the Clerk of the Municipal Court has called around town to try to locate a lawyer who would come. The evidence shows, and we find, that indigent defendants in jail and without counsel have requested counsel at times when no public defender was in court and none was available on call and, consequently, their cases have had to be continued and they have remained in jail.[18] There is also evidence that on occasion persons who state that they wish to plead guilty have not been informed that appointed counsel is available to them if they are indigent. This practice would, of course, tend to deprive indigents of the assistance of counsel in making the initial determination of whether or not to plead guilty.

### (c) Injunctive relief.

■ With respect to relief, the plaintiffs are entitled to an injunction requiring that the practice of failing to furnish prompt and effective counsel to those persons entitled to it under *Argersinger* be promptly terminated. The defendants, Mayor Robinson and Judge Piel, shall file with this court within 30 days a plan which shall include the following: means and methods for furnishing counsel; means to make known to accused persons that if they are indigent they are entitled to appointed counsel; means to determine the indigency or nonindigency of persons who desire appointed counsel; means to record for

---

**16.** Wright refused counsel when his case was heard June 28, but this does not defeat his standing to complain of injury from the absence of court-appointed counsel on June 24.

**17.** Attorneys are appointed by the Montgomery County Circuit Court to represent indigent defendants charged with felonies at preliminary hearings on Wednesdays in Municipal Court.

**18.** Testimony from Judge Springer and from the Chief Clerk of the court supports our finding on this point. The Municipal Court does not maintain records of requests for or offers of court-appointed counsel.

each accused person the existence and the name of counsel if retained, the request or absence of request for appointed counsel if there is no retained counsel, the result of a determination of indigency or nonindigency for each person requesting appointed counsel, and the name of counsel where appointed.[19]

The Supreme Court's recent decision of *Rizzo v. Goode,* 423 U.S. 362, 96 S.Ct. 598, 46 L.Ed.2d 561, 44 U.S.L.W. 4095 (1976), does not preclude injunctive relief directed against Mayor Robinson on this claim and on the appeal bond claim discussed in Part III. In *Rizzo* § 1983 class suits alleged a pervasive pattern of illegal and unconstitutional police mistreatment of minority citizens in particular and Philadelphia residents in general. Defendants included the mayor, the city managing director, and the police commissioner. The District Court required defendants to formulate and submit for court approval a comprehensive program for handling civilian complaints alleging police misconduct, and it specified guidelines suggesting modification of internal departmental procedures pertaining to civilian complaints. The Court of Appeals affirmed the grant of injunctive relief, but the Supreme Court reversed and held, *inter alia,* that the District Court judgment constituted an unwarranted federal judicial intrusion into the discretionary authority of defendants to perform their official functions as prescribed by state and local law.

The majority opinion noted the absence of an "affirmative link between the occurrence of the various incidents of police misconduct and the adoption of any plan or policy by [defendants]—express or otherwise—showing their authorization or approval of such misconduct." 523 U.S. at 371, 96 S.Ct. at 604, 46 L.Ed.2d at 569, 44 U.S.L.W. at 4098. The Court rejected plaintiffs' claimed "right to mandatory equitable relief in some form when those in supervisory positions do not institute steps to reduce the incidence of unconstitutional police misconduct." *Id.* 523 U.S. at 378, 96 S.Ct. at 607, 46 L.Ed.2d at 573, 44 U.S.L.W. at 4100.

The misconduct criticized in *Rizzo* represented personal actions of policemen in the conduct of law enforcement allegedly stemming from racially discriminatory motivations. It proceeded without statutory, constitutional or administrative sanction. Police department executives and the mayor were charged with failure to supervise or discipline their subordinates so as to prevent discriminatory official conduct. No departmental policy of racial discrimination could be established, but it was the department's alleged policy of discouraging the filing of citizen complaints and stifling proof of police misconduct which made them responsible for recurring misconduct. In the instant case, support for the "misconduct" comes not only from a departmental policy but from state law as well. Mayor Robinson must approve Municipal Court policies requiring expenditures or generating revenues, and thereby he is responsible for the particular policies challenged in this lawsuit. We have already noted his direct participation in decisions regarding provisions for court-appointed counsel in Municipal Court. Whatever the limits of the Mayor's specified powers, the record also suggests that court personnel generally regard him as an executive whose participation in or approval of major policy decisions

---

19. This equitable relief is not foreclosed by the Fifth Circuit's refusal in *Gardner v. Luckey,* 500 F.2d 712 (CA5, 1974) to establish minimum standards of constitutional effectiveness for representation of indigents by Florida public defender offices. The thrust of the *Gardner* complaint was the quality of representation rendered indigent defendants by public defenders in their consultative, investigative, and advisory roles. The plaintiffs in the present case focus on the availability of representation for indigent defendants by court-appointed counsel. Where the claim of ineffective representation stems not from the nature of representation but rather from the fact of either no representation or delayed provision of counsel while defendant suffers loss of liberty, equitable relief can be fashioned which guarantees protection of the right to counsel.

is vital. Moreover, we interpret *Rizzo* as safeguarding the "latitude" of state and local executives "in the 'dispatch of [their] own internal affairs'" in the agencies and departments for which they are responsible. See 423 U.S. at 378, 96 S.Ct. at 608, 46 L.Ed.2d at 574, 44 U.S.L.W. at 4100. Whether criminally accused indigents are denied the constitutional right to counsel and the statutory right to an appeal bond solely because of their indigency cannot be relegated to "internal affairs" of Municipal Court operation.

### VI. Incarceration of indigents for nonpayment of fines

Montgomery Municipal Court defendants unable to pay assessed fines and costs have been confined in jail on a "work-out" arrangement authorized by Tit. 37, § 586, Code of Ala. (Cum.Supp. 1973).[20]

#### (a) Standing and case or controversy; the plaintiff class.

Plaintiff Wright claims application of this statute to indigents is unconstitutional under *Tate v. Short,* 401 U.S. 395, 91 S.Ct. 668, 28 L.Ed.2d 130 (1971), and he seeks declaratory and injunctive relief

to assure compliance with the letter and spirit of that decision. He also claims personal damages.

On March 6, 1974, Wright was convicted of three traffic offenses and fined a total of $159. Since Judge Piel also bound him over for grand jury action on a felony charge, Wright was transferred from city to county jail, and the Municipal Court lodged a detainer against him on the unpaid fines. When the felony case was *nolle prosequi* on May 15, he was immediately returned to city jail to work out his fines for a period of 20 days. He served 11 days, escaped from jail, and eventually completed his work-out confinement four days prior to this suit.

We reach the merits of the constitutional claim on this cause of action because Wright's claim for compensatory and punitive damages, analyzed separately in Part VII, is predicated in part on unconstitutional application of Tit. 37, § 586 to him. That § 1983 claim survived his release from jail and presents a justiciable dispute requiring an initial declaratory judgment. See *Powell v. McCormack,* 395 U.S. 486, 496–500, 89 S.Ct. 1944, 1954, 23 L.Ed.2d 491, 502–505 (1965).[21] In *Wolff v. McDonnell,* 418

**20.** Tit. 37, § 586:

"The recorder trying any person for violation of any bylaw or ordinance of the city shall, upon conviction of such person, have the power to fine and imprison him and to sentence him to hard labor upon the streets or public works, or in the workhouse or house of correction of the city; and in the event the fines and cost are not presently paid, to require the offender or person thus in default to work out the fine and costs under the direction of the city authorities, allowing not less than seven dollars and fifty cents ($7.50) for each day's service. No fine shall exceed two hundred dollars ($200.00), and no sentence of imprisonment or hard labor shall exceed six months (6), and no female shall be required to work on the streets of the city. The recorder trying any case, if the defendant be convicted, may accept a confession of judgment of the defendant and sureties for the fine and cost which may contain a waiver of exemptions as to personalty, and if such judgment is not paid in ninety days (90) the recorder shall issue an execution thereon against the defendant

and sureties which may be collected by the chief of police of the municipality or any lawful officer just as are executions issued on judgments from courts of law in this state."

**21.** In *Powell,* plaintiff sought injunctive and declaratory relief from the House of Representatives' refusal to seat him in the 90th Congress to which he had been duly elected. Subsequent to the lower court's dismissal of his complaint for want of subject-matter jurisdiction, the 90th Congress terminated and Powell was elected as a member of the 91st Congress. The Supreme Court held that his claim for back salary remained viable and depended on a declaratory judgment that he was unlawfully excluded from the 90th Congress. "Where one of the several issues presented becomes moot," the Court observed, "the remaining live issues supply the constitutional requirement of a case or controversy." 395 U.S. at 497, 89 S.Ct. at 1951, 23 L.Ed.2d at 502. *See also Chesney v. Adams,* 377 F.Supp. 877, 890 (D.Conn.1974), *aff'd* 508 F.2d 836 (CA2, 1975), where despite a state prisoner's return to the

U.S. at 554–55, 94 S.Ct. at 2973, 41 L.Ed.2d at 950, the Supreme Court recognized that a properly raised § 1983 damage claim may be so grounded on allegedly unconstitutional acts as to require for its ultimate disposition a declaratory judgment which otherwise would be inappropriate on jurisdictional grounds. Since no state prosecutions are pending or imminent in this case, considerations of comity and federalism do not weigh against this procedure.

**(b) Constitutionality of § 586 as applied and of court practices.**

In *Tate v. Short* the Supreme Court held that imprisonment of an indigent solely because he is too poor to pay fines imposed by a state court for traffic offenses constitutes invidious discrimination in violation of the equal protection clause of the Fourteenth Amendment. The constitutional infirmity inheres whether or not the offense is punishable by fines only or by fines and imprisonment and whether or not the jail term of the indigent extends beyond the maximum term that might be imposed on a person willing and able to pay a fine. *Id.* 401 U.S. at 398, 91 S.Ct. at 670, 28 L.Ed.2d at 133.

 Insofar as Tit. 37, § 586 requires all defendants with unpaid fines and costs to work them out in confinement at the rate of $7.50 a day, we hold that its application to indigents constitutes invidious discrimination in violation of the equal protection clause of the Fourteenth Amendment. *Tate* prohibits the

jailing of defendants solely because they are too poor to make immediate payment of assessed fines and costs.

Since *Tate v. Short* was decided in March 1971 three judges, including Judge Piel, have presided over Montgomery Municipal Court, and the record reflects their full awareness of the decision. They claim that in good faith they have complied with the decision, pointing to evidence of a recommended policy of "liberal continuances, installment payment of fines, and absolute release of defendants unable to pay a fine." Despite the evidence of some compliance procedures, there is uncontroverted evidence that *Tate* was being violated from the beginning of January 1974 until a few weeks prior to the institution of this action.[22] Defendants complain that the records used to establish these violations do not indicate the financial status of an offender or whether he was granted a continuance to pay the assessed fine. Significantly, however, 41 violations of *Tate* were uncontroverted after defendants completed a comprehensive scrutiny of these records.

 The Supreme Court emphasized in *Tate* that there is no constitutional infirmity in imprisoning a defendant with the means to pay a fine who refuses or neglects to do so. We recognize the practical problems inevitably inherent in determining when a defendant has the means to pay a fine and when he does not. A city protects judicially-recognized legitimate interests when it de-

---

general prison population, his claim for damages resulting from his transfer to a hospital for the mentally ill helped to present the court with a controversy of "immediacy and reality" warranting declaratory relief.

**22.** There is additional evidence of violations occurring before this six-month period. For example, Warden Strickland, whose staff shared responsibility for converting fines to work-out confinement periods pursuant to the statutory rate, acknowledged that he had not seen the policy memorandum setting out procedures for compliance with *Tate,* but he opined that "it was violated from the beginning of 1972." There is evidence that a local attorney corresponded in 1973 with the then

presiding judge about a specific violation involving a client. In March 1974 a jail inmate alleging indigence wrote directly to the Mayor seeking relief from confinement due to nonpayment of fines. On April 18, 1974, Strickland was questioned by an F.B.I. agent about a federal complaint grounded on non-compliance with *Tate.* With the approval of his superior, the Chief of Police, Strickland immediately apprised Judge Piel of the matter in writing, complaining that " . . . in my humble opinion, we are in violation of the law . . . the Court is forcing me to illegally incarcerate persons on unpaid committed fines." A personal meeting between Strickland and Judge Piel ensued but no policy changes then resulted.

vises means to test indigency claims, but they must be fair and bear some reasonable relationship to attainment of the desired ends. Around June 1, 1974, the Municipal Court began policy changes which permit time extensions for indigents unable to make immediate payment of fines. However, the situation has been only partially ameliorated, for there appears to be a plenary rule requiring confinement until 5:00 p. m. each day of all defendants who have not forthwith paid fines imposed on that day. We can discern no rational basis for the sweeping rule of confinement until 5:00 p. m., and the City offers no persuasive justification. We therefore hold it unacceptable under *Tate.*

### (c) Injunctive relief.

■ Since defendants are now largely complying with *Tate,* no injunctive relief is warranted.[23]

### VII. Claims for damages

Plaintiffs Tucker and Wright each request $25,000 compensatory damages and $50,000 punitive damages. Neither plaintiff particularizes his claim to the multiple causes of action asserted,[24] nor is the injury attributed to any particular defendant. All defendants assert immunity from § 1983 damage suits.

■ *Monroe v. Pape,* 365 U.S. 167, 81 S.Ct. 473, 5 L.Ed.2d 492 (1961) precludes a damage award against the City of Montgomery Board of Commissioners (now the Montgomery City Council). As the legally constituted governing body of the City, the Council is not a "person" for § 1983 purposes. *Puckett v. Mobile City Commission,* 380 F.Supp. 593 (S.D. Ala.1974). Judges Piel and Springer are absolutely immune from liability for damages for acts done in the course of their judicial functions. Section 1983 did not abrogate this common law doctrine.

*Pierson v. Ray,* 386 U.S. 547, 87 S.Ct. 1213, 18 L.Ed.2d 288 (1967). Defendant Strickland, sued individually and in his representative capacity as warden of the Montgomery City Jail, accepted plaintiffs for incarceration pursuant to judicial orders of commitment. It follows that "it would be improper if those who are obliged to carry out those orders of commitment would be subject to such an action." *U. S. ex rel. Bailey v. Askew,* 486 F.2d 134 (CA5, 1973) (state correctional division director immune from § 1983 damages for confining appellant pursuant to order of commitment handed down by a court in its judicial role). *See Fowler v. Alexander,* 478 F.2d 694 (CA4, 1973) (sheriff and jailer confining plaintiff temporarily were executing a court order and are immune from damages) and *State of Louisiaha ex rel. Purkey v. Ciolino,* 393 F.Supp. 102 (E.D.La.1974) (prison wardens immune from § 1983 damages for merely asserting custody over a prisoner pursuant to a valid commitment order). Plaintiffs do not assert that Strickland made or failed to make an official judgment or discretionary executive decision causing them damage, nor is it claimed that the orders of commitment were invalid for any reasons apart from the alleged improprieties in the criminal proceedings leading to their issuance. The evidence establishes persistent attempts by Strickland to seek remedies for alleged wrongs brought to his attention. Under these circumstances he is immune from damages.

■ Neither the Attorney General of Alabama nor the Mayor of Montgomery enjoys absolute immunity from suit. The Supreme Court defined the limits of executive immunity in *Scheuer v. Rhodes,* 416 U.S. 232, 94 S.Ct. 1683, 40 L.Ed.2d 90 (1974):

. . . [I]n varying scope, a qualified immunity is available to officers

---

**23.** This conclusion pretermits determination of whether plaintiff Wright presents an actual case or controversy with respect to injunctive relief.

**24.** Both Tucker and Wright challenge the appeal bond requirement and the availability of

counsel for indigent defendants. Wright also asserts standing to attack the practice requiring indigent defendants sentenced to fines and costs to be held in confinement in lieu of payment.

of the executive branch of government, the variation being dependent upon the scope of discretion and responsibilities of the office and all the circumstances as they reasonably appeared at the time of the action on which liability is sought to be based. It is the existence of reasonable grounds for the belief formed at the time and in light of all the circumstances, coupled with good-faith belief, that affords a basis for qualified immunity of executive officers for acts performed in the course of official conduct.

*Id.* at 247–248, 94 S.Ct. at 1692, 40 L.Ed.2d at 130.

*Wood v. Strickland,* 420 U.S. 308, 95 S.Ct. 992, 43 L.Ed.2d 214 (1975), a case involving the immunity of school board officials to § 1983 damage actions, specified the elements of that qualified immunity. Adopting a standard containing both objective and subjective elements of good faith, the Court held that a school board member would not be immune from liability

> if he knew or reasonably should have known that the action he took within his sphere of official responsibility would violate the constitutional rights of the student affected, or if he took the action with the malicious intention to cause a deprivation of constitutional rights or other injury to the student. . . . A compensatory award will be appropriate only if the school board member has acted with such an impermissible motivation or with such disregard of the student's clearly established constitutional rights that his action cannot reasonably be characterized as being in good faith.

*Id.* at 322, 95 S.Ct. at 1001, 43 L.Ed.2d at 225.

Two federal courts of appeals recently faced with § 1983 prisoner suits have applied the *Wood* standards to test the qualified immunity of public officials involved in correctional administration. *Jones v. Diamond,* 519 F.2d 1090, 1100–1102 (CA5, 1975); *Knell v. Bensinger,* 522 F.2d 720, 724–25 (CA7, 1975). See also *McCray v. Burrell,* 516 F.2d 357, 371–72 (CA4, 1975).

 Under these principles, there can be no monetary award against the Attorney General, who is sued in only his official capacity. While he is the state official primarily responsible for enforcement of state law, plaintiffs allege no injury from his actions or inaction in that regard, and there is no evidence of his discretion and responsibilities in the implementation of challenged policies relating to the municipal court practices at issue.

 Whether Mayor Robinson acted within the described limits of executive immunity requires inquiry into the scope of his relevant discretion and official responsibilities. Under the then prevailing commission form of government, the Mayor exercised direct supervision over the division of general administration and finance and was thus charged with the "administration of the legal affairs of the city, including the Recorder's Court." See Code of Alabama, Appx. § 1247(120), 1971 Supp. to Vols. 14 & 14A. We do not read this statutory delineation of administrative responsibilities as a broad grant of power to the Mayor to personally decide and directly supervise policy matters relating to the judicial functions of Municipal Court. It is clear that Mayor Robinson was not intricately involved in the daily operation of the Municipal Court, nor did he exercise control over its judicial procedures. He relied primarily on the Presiding Judge for information on personnel, budgetary, and administrative needs and problems, and his recommendations with respect to the administration of the court were largely those made by the Presiding Judge and the city's legal staff.

There is no evidence that the Mayor had knowledge of or participated in the challenged appeal bond practices. On the other hand, there is considerable evidence that he was aware of the Municipal Court's practices with respect to

counsel for indigents and "work out" of unpaid fines and costs. He promptly referred these matters for legal advice and recommendations. His approval of the hirings of public defenders, initially on a five-day-a-week basis and ·subsequently on a two-day-a-week basis, reflected on each occasion the recommendations of the Municipal Court's Presiding Judge. Deference to advice of subordinates will not always shield a superior from liability for conduct in areas of affirmative duties, but in light of the fact that Mayor Robinson, untrained in the law and unfamiliar with the technicalities of legal process and judicial process, promptly sought guidance from those with greater expertise in those areas, we cannot conclude that he "knew or reasonably should have known that the action he took within his sphere of official responsibility would violate the constitutional rights" of the indigent defendants affected. *Wood,* 420 U.S. at 322, 95 S.Ct. at 1001, 43 L.Ed.2d at 225. The evidence does not show that his conduct was prompted by a "malicious intention to cause a deprivation of constitutional rights or other injury" to plaintiffs Tucker and Wright. *Id.* Their claims for compensatory and punitive damages, though sufficient to invoke § 1983 jurisdiction, do not warrant an award of damages against the Mayor.

### VIII. Notice to defendant class

The judgment in this Rule 23(b)(2) Fed.R.Civ.P. class action renders, *inter alia,* declaratory relief which affects recorder's or municipal courts throughout the State of Alabama. We have held that Judge Piel is properly designated as representative of the recorders, or chief administrative officials otherwise designated, in these courts. To assure that they are promptly and adequately apprised of the constitutional judgments rendered herein, the court directs that counsel for plaintiffs file with the Clerk of this court within 20 days a list of the titles and addresses of all such courts in the State of Alabama, and the Clerk

shall mail to each such court a copy of this opinion and of the injunction contemporaneously issued.