Michael A. CRONIN, Gail A. Cronin, and Angel A. Cronin, p.p.a. Michael A. Cronin, Plaintiffs,

v.

The TOWN OF AMESBURY; The Amesbury Police Department; The Board of Selectmen of the Town of Amesbury; Daniel F. Cleary; R. Claude Gonthier; John M. Koelsch; Joseph E. Leary; William R. McAdams; George A. Motsis; Donna L. Stuart; and Charles B. Wright, the Last Ten Both Individually and as Agents of the Town of Amesbury, Defendants.

Civ. A. No. 93–11890–PBS.

United States District Court, D. Massachusetts.

July 25, 1995.

Peter Antell, James D. Lindley, Antell & Associates, Boston, MA, for Michael A. Cronin, Gail A. Cronin, Angel A. Cronin.

Everett J. Marder, Kopelman and Paige, Boston, MA, Joseph L. Tehan, Jr., Kopelman & Paige, P.C., Boston, MA, for Town of Amesbury, The Amesbury Police Department, Board of Selectmen of the Town of Amesbury, Daniel F. Cleary, Nancy Gonthier, John M. Koelsch, Joseph E. Leary, William R. McAdams, George A. Motsis, Donna L. Stuart, Charles B. Wright.

Maura L. Sheehan, Espinosa & Associates, Boston, MA, Stephen J. Kiely, Boston, MA, Maura L. Sheehan, Law Office of Maura Sheehan, Boston, MA, for Daniel L. Bartley, Nancy Gonthier.

## MEMORANDUM OF DECISION AND ORDER ON DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

SARIS, District Judge.

Plaintiff Michael A. Cronin ("Cronin") alleges that the Town of Amesbury Board of Selectmen, the Town Manager, and certain police officers conspired to terminate him from his position as the town's police chief, in violation of his right to procedural due process under the Fourteenth Amendment. The Town Manager terminated Cronin on

the ground that he lied when he denied under oath writing a pornographic letter. Cronin asserts violations of 42 U.S.C. § 1983, § 1985(3) and state law,[1] and seeks compensatory and punitive damages and injunctive relief. Defendants have moved for summary judgment on the grounds, *inter alia,* that they did not violate plaintiff's procedural due process rights, and that they are protected under the doctrine of qualified immunity. After hearing, the Court *ALLOWS* defendants' motion for summary judgment on the federal civil rights claims and dismisses the pendent state claims without prejudice.

### BACKGROUND

The Court treats the following facts as undisputed for purposes of this motion only.

a. *The Letter*

On January 9, 1988, Inspector Charles B. Wright, a defendant, was looking for petty cash as a flower donation for the funeral of the fire chief's mother in Chief Cronin's desk drawer at the Amesbury Police Department, while Cronin was on vacation. Wright found a sexually explicit, handwritten letter, written on yellow lined paper in response to an advertisement in a pornographic magazine. According to Wright, the letter was stuck in the petty cash location where funds were stored by the union to pay bills, although another officer who had looked in Cronin's desk earlier in the week did not remember seeing a letter there. Wright believed the writing to be that of Chief Cronin, and the letter was signed "Mike." He read it.

With some reluctance, the court repeats the first sentence of the letter, without which the reader cannot fully appreciate the context of this controversy. The letter, dated October 21, 1987, begins: "Hi, you sexy slut! I just saw your ad in the Looking Glass # 13 on page 14. My prick is stiff looking at you with that fat dildo ready to plunge into your pussy." The letter continues with similarly graphic language about consensual sexual activities the writer states he had with a girlfriend. The writer also stated that although he was white he liked seeing his "slut fucked by white and black." The letter concluded by asking the recipient to write "Mike" at I.M.S. at P.O. Box 741, Salisbury, MA 01952. The ad depicted a nude woman with ropes wrapped around her body.

The listed P.O. box was registered to International Marketing Services c/o Michael Cronin. The letter was never sent.

Wright showed the letter to colleagues: Sgt. McAdams, Officer Daniel F. Cleary, Inspector Joseph E. Leary, Officer Gary Wright, and Sergeant Ronald Fournier, who was then Acting Chief while Cronin was on vacation. The six officers made copies and then confronted Cronin on January 19, 1988. According to the defendant police officers, Cronin admitted that he had written the letter, that he had opened a post office box to respond to the advertisement, and that he had made a "serious mistake." He also said he had written the letter to assist a friend, then deceased, in the letter writing because the friend was being blackmailed. Cronin claimed he wrote the letter to get the blackmailer out in the open. Leary and Wright showed the letter to a police psychiatrist, Dr. John Berry, on February 23.

Cronin denies that he admitted authorship of the letter at that January meeting, and continues to do so.[2] The original of the letter is missing, and there is a hotly disputed fact question as to whether Cronin, Wright, or another had destroyed or lost it.

---

1. The Second Amended Complaint contains fifteen (15) counts asserting violation of rights under 42 U.S.C. § 1983 (Counts 1 and 2), violation of rights under the Massachusetts Civil Rights Act (Counts 3 and 4), wrongful termination (Count 5), interference with contractual relations (Count 6), negligent infliction of emotional distress (Count 7), defamation of character (Count 8), common law invasion of privacy (Count 9), statutory invasion of privacy (Count 10), malicious prosecution (Count 11), abuse of process (Count 12), spouse's loss of consortium (Count 13), child's loss of consortium (Count 14), and conspiracy under 42 U.S.C. § 1985(3) (Count 15).

2. Cronin has denied in his complaint that the letter was written by him. However, his testimony under oath has wavered. In his deposition, Cronin stated that the signature on the bottom of the letter was not his. In response to the question: "What about the rest of the text? Is that your handwriting?", Cronin responded "I don't know." (Tr. 134).

Cronin met individually with each of the officers about the letter. The officers urged him to get counseling and to "lighten up" with the other police officers. Cronin informed Joseph Leary that he wrote the letter to protect a prominent person, Arthur Motsis, the father of defendant Selectman George Motsis, now a defendant.

More than two years later, on October 4, 1990, Cleary showed his copy of the letter to Reserve Officer Mark A. Valli because he felt Cronin was acting unfairly to Valli and wanted to give Valli "leverage" over Cronin. In a fight over his request for a night off to see a play with Cleary, Valli made clear to Cronin that he was aware of the letter's existence, and intimated that the other officers were prepared to "back" him. Valli testified that Cronin admitted writing the letter, that Cronin began crying, gave Valli the night off, and offered him $1,000 for Christmas gifts for his children. Other than Valli, no other officer requested anything of value in exchange for withholding disclosure of the document.

### b. *Dispute Over Connor*

In October 1990, Wright, Cleary, Leary and McAdams complained to Chief Cronin that David Connor, newly elevated to the rank of sergeant, acted improperly in his behavior on four occasions. After investigation, Cronin declined to act on this complaint because he believed the complaining officers were having a personality conflict with Connor.

On February 1, 1991, Wright, Cleary, Leary and McAdams, and two others, complained to Town Manager Michael Basque about Cronin's handling of the Connor investigation. Basque also declined to act on the complaint. When Cleary, and others, returned to Basque to ask him about the investigation, he said: "I'm not working for you guys." Cronin was in Basque's office at the time Basque made this statement. Cronin and Basque had a longstanding professional relationship and their wives were co-investors in a local travel agency.

On February 6, 1991, the four police officers brought their complaints to defendant Selectman R. Claude Gonthier at Gonthier's house. Selectman Motsis was also present. In addition to reviving their complaint regarding Connor, they raised a new and volatile charge. They produced a photocopy of the sexually explicit letter that was discovered in Cronin's desk drawer and claimed it was written by Cronin. The officers expressed concern that the letter was demeaning to women and blacks, and might reflect a mental imbalance that would hinder Cronin in the performance of his duties. The officers told the Selectmen that Cronin had explained to them that he wrote the letter to assist a deceased Amesbury citizen who was the subject of blackmail—Motsis' father.

At Gonthier's urging, another meeting about Cronin and the letter was held at the Pow Wow Villa between the five selectmen and seven police officers: Cleary, Leary, the Wright brothers, Richard Pulin, McAdams and Valli. On February 12, 1991, Gonthier held another meeting with Leary, Cleary and Wright to discuss a conversation with Dr. Berry about Cronin's mental health.

On February 13, 1991, at the initiative of Gonthier, the full Board of Selectmen (including defendant George A. Motsis), the Town Manager, Town Counsel and Donna Stuart, as administrative assistant, convened in a closed-door executive session to hear the complaints made by the defendant officers. Cronin was not notified, called to testify, or allowed to confront witnesses.

### c. *The Termination of Cronin*

On March 1, 1991, the Board placed Chief Cronin and Sergeant Connor on paid leave, pending an investigation into the police department. At the recommendation of the Board, Manager Basque later appointed McAdams to the position of Acting Chief, and Cleary to the position of Acting Sergeant. On July 23, 1991, after investigation, the state Attorney General's Office declined to prosecute either Connor or Cronin. Shortly thereafter, defendant Gonthier unsuccessfully tried to pressure Cronin into resigning because he believed Cronin had written a pornographic letter and the "chief of police cannot hold the position in town with that letter attached to him." Cronin refused.

In October 1991, after public hearings concerning the charges against Connor, at which new allegations of brutality came to light, Connor was terminated by Manager Basque.

#### d. *The Demotion of Cronin*

Between January and April, 1992, Acting Town Manager Joseph Fahey investigated the charges against Cronin, who was still on administrative leave. At the end of the investigation, Fahey reported to the Board that he would bring only three charges against Cronin, and recommend at most a 60-day suspension. On April 27, 1992, the Board fired Fahey, and Defendant Donna Stuart, a former administrative assistant to the Board, was appointed as Acting Town Manager to replace him. On April 28, 1992, one day following her appointment, without conducting an independent investigation, Manager Stuart issued nine charges against Cronin, and gave him written notice of these charges. Stuart also threatened to publicly release the charges unless Cronin resigned. Among the charges were that Cronin conducted an incomplete investigation of excessive force by Connor, that he wrote the pornographic letter, that he lied to the Acting Town Manager Fahey as to the purpose of the letter, and that he unnecessarily grabbed the genitals of a male arrestee.

Public hearings were held before Nicholas Foundas, who had previously worked as counsel to the Boston Police Department. The hearings, which took place on May 7, 18, 21 and June 4 and 17, were public at the request of the town and Cronin. Cronin did not object to Foundas' fitness as hearing officer. Cronin was represented by counsel. Cronin denied under oath that the handwriting on the letter was his. The substance of the letter was openly discussed, and it was an exhibit.

On July 7, 1992 Civil Service hearing officer Nicholas Foundas, in a written decision, found Cronin guilty on two charges. First, Cronin was found guilty of having lied to Manager Fahey about details of the conversation he had had with the officers who first confronted him with the sexually explicit letter. Second, Cronin was found guilty of having used poor judgment when, on April 21, 1988, he had jokingly placed his hand upon the genital area of a prisoner taken into custody for lewd behavior. In addition, hearing officer Foundas found as fact that Cronin had written the letter, but concluded that this had no bearing on his duties. As punishment for the two charges on which Cronin was found guilty, the hearing officer recommended a 3-month suspension. Cronin appealed.

On July 16, 1992, notwithstanding the hearing officer's recommendation, Manager Stuart demoted Cronin to sergeant; and on August 17, after 17½ months on paid leave, Cronin returned to active duty. Cronin received a copy of the hearing officer's recommendations and a written copy of the decision to demote him.

On August 17 and 24, 1992, the Board of Selectmen held two public airings to discuss the charges against Cronin. During this public airing, the letter was disclosed. Both were aired on cable television. The Board of Selectmen released the sexually explicit letter to the press on August 18, 1992.

#### e. *Alleged Threat by Leary*

Between August 1992 and March 1993, Cronin filed complaints with Acting Chief McAdams and with the Clerk-Magistrate's office of the Newburyport District Court, alleging that Inspector Leary had threatened his life. Defendant Leary had stated to a Selectman in front of the Clerk-Magistrate that he would take a baseball bat to Cronin's head if he returned to the police department. On August 18, 1992, Cronin wrote a letter to McAdams, the Acting Chief of Police, complaining about Leary and accusing him of having certain psychological, sexual and personal drinking problems. McAdams wrote back that he viewed the letter as an attempt to discredit an officer who had testified against him, and that the charges were without factual support. Sgt. Cleary also investigated the matter. Leary received a reprimand for making a threat to another police officer who supported Cronin.

Other than having a prior hostile relationship with Leary, Cronin had an amicable professional one with the other officers.

Also, Cronin had had a benign relationship with Gonthier and Motsis who, previous to the letter incident, had offered to turn over the Town Manager position to him.

### f. Termination

On October 5, 1992, Stuart was succeeded as Town Manager by defendant John M. Koelsch.

Daniel Bartley, an Amesbury citizen, accused Cronin of lying under oath, and Cleary investigated the charge and submitted a report. On April 17, 1993, Manager Koelsch issued new charges against Cronin—for lying under oath when he denied authorship of the letter at earlier hearings and conduct unbecoming of an officer. Koelsch designated himself as Civil Service hearing officer.

At the hearings, Cronin was represented by counsel, and could examine and cross-examine witnesses. A handwriting expert testifying for the town opined that there was a high probability that the handwriting on the copy of the letter was Cronin's. There was no rebuttal handwriting testimony. After conducting three days of hearings, on June 17, 1993 Manager Koelsch found Cronin guilty, by a preponderance of the evidence, of lying under oath about authorship of the letter, and in so lying, acting in a manner unbecoming an officer. Cronin was terminated. The Department of Employment and Training later decided to award him unemployment benefits, over the protest of the Town of Amesbury.

### g. The Civil Service Commission

On July 20, 1993, the first Civil Service decision—that of hearing officer Foundas—was reversed by the Civil Service Commission, in accordance with an administrative magistrate's recommendation based on hearings on April 26 and 27, 1993. The administrative magistrate found that Cronin had not given a false statement to Fahey. The administrative magistrate made no findings as to authorship of the letter. She held that Cronin was not guilty on both of the counts on which he had been found guilty, and further recommended that Cronin be restored to his previous position. She noted that the timing of Manager Fahey's replacement by Stuart was "extremely troubling."

Cronin appealed Koelsch's decision of June 17, 1993 to terminate him, and a hearing was held before the Civil Service Commission.[3] As of this court's last inquiry, the appeal of Koelsch's decision to the Civil Service Commission pursuant to Gen.L. ch. 31, § 43 is still pending.

## DISCUSSION

### A. Summary Judgment Standard

A motion for summary judgment must be granted if:

> [T]he pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.

Fed.R.Civ.P. 56(c). "It is apodictic that summary judgment should be bestowed only when no genuine issue of material fact exists and the movant has successfully demonstrated an entitlement to judgment as a matter of law." *In re Varrasso,* 37 F.3d 760, 762 (1st Cir.1994) (citing cases).

"To succeed, the moving party must show that there is an absence of evidence to support the nonmoving party's position." *Rogers v. Fair,* 902 F.2d 140, 143 (1st Cir.1990). If this is accomplished, the burden then "shifts to the nonmoving party to establish the existence of an issue of fact that could affect the outcome of the litigation and from which a reasonable jury could find for the [nonmoving party]." *Id.* (citations omitted). The nonmovant cannot simply rest upon mere allegations. *Id.* Instead, the nonmoving party must adduce specific, provable facts which establish that there is a triable issue. *Id.* Rule 56(e) "requires nonmovants to submit evidence that would be admissible at trial to oppose properly submitted motions for summary judgment." *FDIC v. Fonseca,* 795 F.2d 1102, 1110 (1st Cir. 1986). "There must be 'sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party. If the evi-

---

**3.** The record before this court is unclear as to the date of that hearing.

dence is merely colorable or is not significantly probative, summary judgment may be granted.'" *Rogers, supra* (quoting *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 249–50, 106 S.Ct. 2505, 2511, 91 L.Ed.2d 202 (1986)).

### B. *Section 1983 Claims*

■ Section 1983 " 'is not itself a source of substantive rights,' but merely provides 'a method for vindicating federal rights elsewhere conferred.'" *Graham v. Connor,* 490 U.S. 386, 389–94, 109 S.Ct. 1865, 1870, 104 L.Ed.2d 443 (1989) (citation omitted). Plaintiff asserts his claims under the procedural component of the due process clause, to redress alleged wrongful deprivations of liberty and property interests. *Zinermon v. Burch,* 494 U.S. 113, 125, 110 S.Ct. 975, 983, 108 L.Ed.2d 100 (1990).

■ As a threshold matter, the Amesbury Police Department, a town department, and the Board of Selectmen are not properly named defendants. *See e.g., Post v. City of Fort Lauderdale,* 750 F.Supp. 1131, 1132 (S.D.Fla.1990) (dismissing a § 1983 suit against a police department on the ground that police department is an integral part of city, and lacked a legal identity apart from the city); *Tucker v. City of Montgomery,* 410 F.Supp. 494, 511 (M.D.Ala.1976) (city council not a person for section 1983 purposes). However, the Town of Amesbury is a properly named party. Accordingly, if plaintiff establishes that the Board of Selectmen or an officer who possesses final authority to establish policy, like a Town Manager, violated plaintiff's rights to procedural due process, the town is liable. *Monell v. City of New York Dept. of Social Services,* 436 U.S. 658, 694, 98 S.Ct. 2018, 2037, 56 L.Ed.2d 611 (1978); *Kinan v. Brockton,* 876 F.2d 1029, 1035 (1st Cir.1989).

### C. *Procedural Due Process*
#### 1. *Protected Interests*

In analyzing a claimed denial of procedural due process, the court must first determine whether the plaintiff has a constitutionally protected interest. Here, the plaintiff has three constitutionally protected interests.

#### a. *Employment*

■ First, because he can only be dismissed for just cause pursuant to Mass. Gen.L. ch. 31, § 41, Cronin has a protected property interest in continued employment. *See Board of Regents of State Colleges v. Roth,* 408 U.S. 564, 576–78, 92 S.Ct. 2701, 2708–09, 33 L.Ed.2d 548 (1972).

#### b. *Reputation*

■ Second, Cronin has a liberty interest in his reputation which implicates Fourteenth Amendment safeguards. Damage to one's reputation is not "by itself sufficient to invoke the procedural protection of the Due Process Clause," although loss of reputation, coupled with some other tangible element, may rise to the level of a protectible liberty interest. *Paul v. Davis,* 424 U.S. 693, 701, 96 S.Ct. 1155, 1160–61, 47 L.Ed.2d 405 (1976); *see Roth,* 408 U.S. at 573, 92 S.Ct. at 2707 ( [G]overnment employee's liberty interest would be implicated if he were dismissed based on charges that imposed on him a stigma or other disability that foreclosed his freedom to take advantage of other employment opportunities.); *See, e.g., Palmer v. City of Monticello,* 31 F.3d 1499, 1503 (10th Cir.1994) (to establish claim of deprivation of liberty interest, plaintiff must prove "termination based on a publicized charge of sufficient opprobrium that would make plaintiff an unlikely candidate" for employment).

While defamation by a governmental official, standing alone, does not work a deprivation of liberty protected by the Fourteenth Amendment, governmental action altering a right or status previously held under state law "combined with the injury resulting from the defamation, justifie[s] the invocation of procedural safeguards." *Rodriguez de Quinonez v. Perez,* 596 F.2d 486, 489 (1st Cir. 1989), citing *Paul v. Davis,* 424 U.S. 693, 708–09, 96 S.Ct. 1155, 1164, 47 L.Ed.2d 405 (1976). The First Circuit has adopted the "stigma-plus" test:

"To establish a liberty interest sufficient to implicate fourteenth amendment safeguards, the individual must be not only stigmatized, but also stigmatized in connection with a denial of a right or status previously recognized under state law."

Here, Cronin was dismissed from a tenured government position based on a charge of perjury, which has substantially foreclosed his freedom to take advantage of other employment opportunities. Further, his earlier suspension and demotion were based on charges *inter alia* of having written a pornographic letter which similarly stigmatize him. Under the stigma-plus test, Cronin had presented sufficient admissible evidence to establish a protected liberty interest in his reputation.

### c. *Privacy*

■■■ Third, plaintiff has a protected liberty interest in his right to privacy. The Fourteenth Amendment protects "substantive aspects of liberty," including freedom of choice with respect to certain basic matters such as private social activities. *See Shawgo v. Spradlin*, 701 F.2d 470, 482 (5th Cir.1983) (holding no violation of the officers' qualified right to privacy where state prescribed cohabitation of two police officers of different rank), *cert. denied*, 464 U.S. 965, 104 S.Ct. 404, 78 L.Ed.2d 345 (1983) quoting *Roe v. Wade*, 410 U.S. 113, 153, 93 S.Ct. 705, 726, 35 L.Ed.2d 147 (1973). However, the right to privacy is not unqualified. *Id. See* opinion of Justice Brennan, dissenting from the decision to deny certiorari in *Shawgo*, 464 U.S. at 971, 104 S.Ct. at 408 (stating that "lawful, off-duty sexual conduct clearly implicates the fundamental right to be free, except in very limited circumstances," from unwanted governmental disclosure or interference with certain kinds of "intensely personal decisions," although pointing out that lower courts "have divided sharply" on issues concerning the regulation of the private conduct of public employees). *See also McCabe v. Sharrett*, 12 F.3d 1558, 1568 (11th Cir.1994) (finding liberty-grounded intimate association right of public employees entitled to special constitutional protection).

The lower courts are divided on the question of whether sexual conduct outside marriage is constitutionally protected. *See Briggs v. North Muskegon Police Dep't*, 563 F.Supp. 585, 589–90 (W.D.Mich.1983) (collecting cases), *aff'd*, 746 F.2d 1475 (6th Cir.1984), *cert. denied by less-than-unanimous vote*, 473 U.S. 909, 105 S.Ct. 3535, 87 L.Ed.2d 659 (1985). *See generally* Annotation, 9 ALR 4th 614 (collecting divergent state holdings on police officers' discipline for sexual misconduct). *Shuman v. Philadelphia*, 470 F.Supp. 449, 459 fn. 8 (E.D.Pa.1979) ("In the absence of a showing that a policeman's private, off-duty personal activities have an impact upon his on-the-job performance," the court reasoned, "we believe that inquiry into those activities violates the constitutionally protected right of privacy"). *See Briggs*, 746 F.2d at 1475 (married policeman could not be fired for living with a woman other than his wife); *Wilson v. Taylor*, 733 F.2d 1539, 1544 (11th Cir.1984) (policeman could not be fired for dating daughter of convicted felon); *Thorne v. City of El Segundo*, 726 F.2d 459, 471 (9th Cir.1983) (inquiry into police candidate's past sexual history was unconstitutional); *Swope v. Bratton*, 541 F.Supp. 99, 109 (W.D.Ark. 1982) (married policeman could not be disciplined for live-in arrangement with woman employed by the department).

■■■ There does seem, however, to be wide agreement that off-duty sexual activities are not protected when they violate a statute. *See Walls v. Petersburg*, 895 F.2d 188, 193 (4th Cir.1990) (inquiring about police candidates' criminal homosexual activities constitutionally permissible); *Fleisher v. City of Signal Hill*, 829 F.2d 1491, 1498 (9th Cir. 1987) (disciplining police officer for statutory rape constitutionally permissible); *Fugate v. Phoenix Civil Serv. Bd.*, 791 F.2d 736, 741– 742 (9th Cir.1986) (disciplining police officer for relations with prostitutes constitutionally permissible); *Andrade v. Phoenix*, 692 F.2d 557, 559 (9th Cir.1981) (disciplining police officer for criminal adultery constitutionally permissible). *Cf. Daley v. Judge of District Court of Western Hampden*, 304 Mass. 86, 97–98 23 N.E.2d 1, 8 (1939) (upholding removal of chief of police for driving while intoxicated in violation of statutory duty).

A public employer may discipline tenured public employees for private activities "reasonably related to the fitness of the employee to perform in his position." Mass.Gen.L. ch. 31, § 43. *See Fugate*, 791 F.2d at 741 ("The City has legitimate interests in maintaining the moral integrity, and public acceptance of

the police department, and in minimizing conflicts of interest and risks of blackmail."); *Shuman* at 459 ("if the sexual activities took place in a small town, the public employer might very well have an interest in investigating such activities and possibly terminating an employee") (citing cases); *Baron v. Meloni*, 556 F.Supp. 796, 800 (W.D.N.Y.1983) (police officer could be disciplined for publicly consorting with known mobster's wife).

This court concludes that plaintiff has a liberty interest in his private sexual activities and fantasies which are constitutionally protected against unwarranted government intrusion and disclosure. However, this liberty interest is a qualified right which must be balanced against the town's justifiable concerns about the private conduct's impact on Cronin's effectiveness as a police chief, his trustworthiness as custodian of prisoners, and his susceptibility to blackmail.

### 2. *Adequacy of Procedures Under Due Process Clause*

▆ Where protected interests in employment are at stake, a pretermination hearing is required by the due process clause, but it "need not be elaborate." *Cleveland Bd. of Educ. v. Loudermill*, 470 U.S. 532, 546, 105 S.Ct. 1487, 1495, 84 L.Ed.2d 494 (1985). The "tenured employee is entitled to oral or written notice of the charges against him, an explanation of the employer's evidence, and an opportunity to present his side of the story." *Id.* "[I]n those situations where the employer perceives a significant hazard in keeping the employee on the job, it can avoid the problem by suspending with pay." 470 U.S. at 544–45, 105 S.Ct. at 1495. Elaborate pretermination proceedings are not mandated because of the excessive burden they would put "on the government's interest in quickly removing an unsatisfactory employee." 470 U.S. at 546, 105 S.Ct. at 1495.

▆ The court's holding in *Loudermill* was premised in part on the provisions in state law for a full post-termination hearing. *Id.* at 547–48, 105 S.Ct. at 1496. The Due Process Clause requires the post-termination hearing to be held "at a meaningful time." *Id.* "At some point, a delay in the post-termination hearing would become a constitutional violation." *Id.* at 547, 105 S.Ct. at 1496. The "existence of post-termination procedures is relevant to the necessary scope of pretermination procedures." *Id.* at 547 n. 12, 105 S.Ct. at 1496 n. 12.

▆ Section 1983 claims for deprivation of either property or liberty without procedural due process are governed by standards developed in three Supreme Court cases. *Compare Zinermon v. Burch*, 494 U.S. 113, 110 S.Ct. 975, 108 L.Ed.2d 100· (1990) *with Hudson v. Palmer*, 468 U.S. 517, 104 S.Ct. 3194, 82 L.Ed.2d 393 (1984) *and Parratt v. Taylor*, 451 U.S. 527, 101 S.Ct. 1908, 68 L.Ed.2d 420 (1981). The First Circuit has explained the dynamics of these three cases:

> *Parratt* and *Hudson* teach that if a state provides adequate post-deprivation remedies—either by statute or through the common-law tort remedies available in its courts—no claim of a violation of procedural due process can be brought under § 1983 against the state officials whose random and unauthorized conduct occasioned the deprivation.... *Zinermon* requires that courts scrutinize carefully the assertion by state officials that their conduct is "random and unauthorized."

*Lowe v. Scott*, 959 F.2d 323, 340–41 (1st Cir.1992).[4] Applying this analysis, the First Circuit found that no section 1983 claim accrued when a state medical licensing board unpredictably and unforeseeably ignored its own established procedures, subject to an adequate post-deprivation remedy. *Lowe*, 959 F.2d at 343. *Accord Reid v. State of New Hampshire*, 56 F.3d 332, 340–41 (1st Cir.1995) ("[A] procedural due process claim

---

4. *Accord Caine v. Hardy*, 943 F.2d 1406, 1413 (5th Cir.1991) (en banc) (*Zinermon* "requires a hard look at a *Parratt/Hudson* defense to determine whether the state officials' conduct, under all the circumstances, could have been adequately foreseen and addressed by procedural safeguards"); *Easter House v. Felder*, 910 F.2d 1387,

1402 (7th Cir.1990) (en banc) (*"Zinermon* holds only that predictable deprivations of liberty and property which flow from authorized conduct are compensable under § 1983"), *cert. denied*, 498 U.S. 1067, 111 S.Ct. 783, 112 L.Ed.2d 846 (1991).

may not be redressed under section 1983 where an adequate state remedy exists").

At least two courts have invoked the *Parratt/Hudson* analysis to deny section 1983 claims deriving from Civil Service termination hearings. The Second Circuit has held that an evidentiary error at a civil service termination hearing was a "random and unauthorized act," and that the state's Civil Service appeal procedure provided an adequate post-deprivation remedy. *Marino v. Ameruso,* 837 F.2d 45, 47 (2d Cir.1988) (Winter, J.) Yet more closely analogous to the instant case was an opinion following *Marino, Pleickhardt v. Janoski,* 1989 WL 47705 (E.D.N.Y.1989). *Pleickhardt* held, *inter alia,* that a Town Board's arrogation of the dual function of filing and adjudicating a charge leading to a police officer's termination was a "random and unauthorized act," insofar as New York Civil Service law did not in any way authorize Town Board members to act as partial adjudicators. *Id.* at *4–*5.

### 3. *Adverse Employment Decisions*

Here, plaintiff claims that three adverse employment decisions violated his due process rights: his suspension with pay; his demotion; and his termination.

#### a. *Suspension without Pay*

■ *Loudermill* suggests the propriety of a suspension with pay in circumstances where the employer perceives a significant hazard in keeping an employee on the job. Here, the Board of Selectmen had information from seven police officers that the chief of police had written a pornographic letter, and that he acted in a way which cast doubt on his psychological well being upon being confronted with the letter. In light of the complaints, the selectmen had a reasonable belief that an investigation was needed and that Cronin's continuation as chief posed significant hazard to the operations of the department. *Cf. DeCosta v. Chabot,* 59 F.3d 279 (1st Cir.1995). *See Broderick v. Police Commissioner of Boston,* 368 Mass. 33, 37, 330 N.E.2d 199, 202, *cert. denied,* 423 U.S. 1048, 96 S.Ct. 773, 46 L.Ed.2d 636 (1975) (inquiry into private affairs of a police officer's life is permissible where it bears a sufficiently rational connection to the officer's

fitness and ability to serve in his position). Although Cronin complains that he did not get a pre-suspension hearing, *Loudermill* does not require one where the suspension is with pay. Plaintiff claims that the town violated the open meeting law by considering in closed executive session charges against Cronin and Connor without giving advance notice and an opportunity to appear pursuant to Mass.Gen.L. ch. 39, § 23B(1). The town argues that Gen.L. ch. 23B(5) applies because a charge of criminal misconduct was being discussed. As no property or liberty interest was implicated, this court need not resolve the dispute because any violation of this state law does not implicate procedural due process concerns. Indeed, at least one court has held that a public employee's suspension *with* pay does not implicate a constitutionally protected property interest. *Pierce v. Engle,* 726 F.Supp. 1231, 1237 (D.Kan.1989).

#### b. *Demotion*

■ With respect to Cronin's demotion, he has failed to present admissible evidence to support a procedural due process claim. There is no evidence that the demotion hearings before hearing officer Foundas were biased. Even if the Board of Selectmen acted inappropriately under state law in making its administrative assistant the appointing authority for purposes of disciplining Cronin—which this court need not determine—that is precisely the kind of random and unauthorized conduct which state post-deprivation remedies were designed to address. The post-deprivation procedure before the Civil Service Commission resulted in plaintiff's reinstatement and back pay. *See Archuleta v. Colorado Dept. of Institutions,* 936 F.2d 483, 491 (10th Cir.1991) (no procedural due process claim where post-deprivation proceedings restored property interest); *Sewell v. Jefferson County Fiscal Court,* 863 F.2d 461, 467 (6th Cir.1988) (same). The fact that plaintiff could obtain more relief under § 1983 does not mean that the remedy for the temporary deprivation of property was constitutionally inadequate. *Archuleta,* 936 F.2d at 491. *See also Lee v. Hutson,* 810 F.2d 1030, 1032–1033 (11th Cir.1987) (no pro-

cedural due process violation despite claim of a biased and sham hearing where the state provided an adequate post-deprivation remedy).

### c. The Termination

■ With respect to the decision to terminate, plaintiff alleges that the hearing officer (Town Manager Koelsch) was biased, and that the termination decision was effectively made by the Board of Selectmen. There is no evidence that Koelsch had any personal bias or prejudice against Cronin that raises due process concerns. *Cf. Withrow v. Larkin,* 421 U.S. 35, 46–47, 95 S.Ct. 1456, 1464, 43 L.Ed.2d 712 (1975) (discussing types of bias in decisionmaker so egregious as to pose constitutional difficulty, such as where an adjudicator has a pecuniary interest in the outcome or has been the target of abuse or criticism by the party before him); *Schweiker v. McClure,* 456 U.S. 188, 197, 102 S.Ct. 1665, 1671, 72 L.Ed.2d 1 (1982) (discussing imputation of bias from an allegedly interested group to hearing officers on whom the group exerts influence). *Contrast Police Comm'r of Boston v. Municipal Court of the W. Roxbury Dist.,* 368 Mass. 501, 507, 332 N.E.2d 901 (1975) (hearing officer not disinterested where counsel represented his wife in acrimonious divorce proceedings).

■ Due process does not "require the state to provide an impartial decisionmaker at the pretermination hearing." *Schaper v. City of Huntsville,* 813 F.2d 709, 715 (5th Cir.1987) (police captain complaining that he was terminated after a biased hearing did not state due process claim where there was a right of appeal and post-termination hearing). *See, Arnett v. Kennedy,* 416 U.S. 134, 170 n. 5, 94 S.Ct. 1633, 1652 n. 5, 40 L.Ed.2d 15 (1974) ("In most cases, the employee's supervisor is the official best informed about the 'cause' for termination. If disqualification is required on the ground that the responsible supervisor could not be wholly impartial, the removal procedure would become increasingly complex") (Powell, J. concurring). The state is obligated only to make available the means by which Cronin can receive post-termination redress for any unlawful deprivations.

■ A party contending "that the combination of investigative and adjudicative functions necessarily creates an unconstitutional risk of bias in administrative adjudication" has a "difficult burden of persuasion to carry" because he must overcome "a presumption of honesty and integrity in those serving as adjudicators." *Withrow v. Larkin,* 421 U.S. at 47, 95 S.Ct. at 1464. Here, Koelsch was not the investigator of the charge of perjury. Cronin did not file a motion for the disqualification of Koelsch on grounds of bias, and there is no evidence of any animus against Cronin. There is also no evidence that the Board of Selectmen, rather than Koelsch, made the termination decision in violation of the Amesbury Town Charter, which makes the Town Manager the appointing authority. Amesbury Town Charter, Art. 4, § 4–21(b).

Plaintiff does not allege that defendants violated the Civil Service procedures provided in Mass.Gen.L. ch. 31, § 41, *et seq.* Section 41 requires written notice of the charges before termination and "a full hearing ... *before the appointing authority* or a hearing officer designated by the appointing authority." The Act does not require the appointment of hearing officer who is different from the charging official. After the hearing, the appointing authority must give the employee a written notice of his decision and the reasons for it. The employee must "be allowed to answer, personally or by counsel, any of the charges which have been made against him." Any hearing "shall be public if either party to the hearing files a written request that it be public." There is no evidence that Cronin requested a disinterested hearing officer pursuant to Mass.Gen.L. ch. 31, § 41A.

The state provides a full panoply of post-deprivation administrative procedures. Pursuant to Mass.Gen.L. ch. 31, § 43, a person aggrieved by a decision of an appointing authority may appeal to the Civil Service Commission, and must be given a hearing before a member of the Commission or a disinterested person who must file a report of findings with the commission. *Id.* The standard of proof is a preponderance of the evidence. *Id.* Mass.Gen.L. ch. 31 § 44 pro-

vides for judicial review of the Commission's decision.

 Cronin does argue, however, that Koelsch erred in relying on a photocopy of the letter in reaching his decision that Cronin lied to Foundas about its authorship. Under state law, the hearing conducted by a local official need not be according to "strict evidentiary procedure, so long as substantial justice is done." *Whitney v. Judges of Dist. Ct. of Northern Berkshire,* 271 Mass. 448, 461, 171 N.E. 648, 650 (1930). Even if the rules of evidence were strictly applicable, the hearing officer did not err in allowing introduction of the duplicate of the letter, as there was conflicting evidence concerning its loss or destruction, and there was evidence it accurately reflected the original. *See* P.J. Liacos, M. Brodin and M. Avery, *Handbook of Massachusetts Evidence,* § 12.7.1 (Sixth ed. 1994). *Cf.* Fed.R.Evid. 1003. Even if an evidentiary error had been made, there were adequate state procedures to correct the error. *See Marino v. Ameruso,* 837 F.2d at 47 (no procedural due process claim where the sole issue was an allegedly erroneous evidentiary ruling where adequate state procedures were available to correct the error); *Gniotek v. City of Philadelphia,* 630 F.Supp. 827, 835 (E.D.Pa.1986), *aff'd,* 808 F.2d 241 (3d Cir. 1986), *cert. denied,* 481 U.S. 1050, 107 S.Ct. 2183, 95 L.Ed.2d 839 (1987) (rejecting due process claim that defendants erred in basing their decisions to terminate the officers on uncorroborated hearsay where review by state judiciary is available).

Finally, Cronin's argument that his procedural due process rights were violated because he was entitled to a standard of proof beyond a reasonable doubt on the charge of making false statements under oath is without merit. *See Commissioners of Civil Serv. v. Municipal Court of Brighton,* 369 Mass. 166, 173, 338 N.E.2d 829, 833 (1975), *cert. denied,* 429 U.S. 845, 97 S.Ct. 125, 50 L.Ed.2d 116 (1976), citing *Kowal v. United States,* 412 F.2d 867, 870, 188 Ct.Cl. 631 (1969) (applying burden of proof of preponderance of evidence in removal proceeding based on charges that police officer's conduct made him unfit for duty although he was acquitted of parallel criminal charges).

### 4. *Delay in Post–Deprivation Remedies*

The time delay in the post-deprivation remedies is, however, of great concern. Two years have elapsed since Cronin was terminated by Manager Koelsch. Although a hearing was held, the Civil Service Commission has yet to issue a decision.

The Supreme Court has recognized that "[a]t some point, a delay in the post-termination hearing would become a constitutional violation." *Loudermill,* 470 U.S. at 547, 105 S.Ct. at 1496; *accord Schroeder v. Chicago,* 927 F.2d 957, 960 (7th Cir.1991) ("[A]t some point delay must ripen into deprivation, because otherwise a suit alleging deprivation would be forever premature") (Posner, J.); *Isaacs v. Bowen,* 865 F.2d 468, 477 (2d Cir. 1989); *Givens v. United States Railroad Retirement Bd.,* 720 F.2d 196, 201 (D.C.Cir. 1983), *cert. denied,* 469 U.S. 870, 105 S.Ct. 219, 83 L.Ed.2d 149 (1984); *Kelly v. Railroad Retirement Bd.,* 625 F.2d 486, 490 (3d Cir.1980).

In practice, however, courts have been reluctant to declare a tardy post-deprivation remedy inadequate except in extreme cases, in recognition of the regrettable fact that "delay is a natural concomitant of our administrative bureaucracy." *Isaacs,* 865 F.2d at 477. *Compare Kraebel v. New York City Department of Housing Preservation & Development,* 959 F.2d 395, 405 (2d Cir.1992) (delay in reimbursement of landlord for certain senior citizen tenant rents of up to 4 years worked denial of due process, where landlord was indisputably entitled to the payments sought), *cert. denied,* —— U.S. ——, 113 S.Ct. 326, 121 L.Ed.2d 245 (1992); *Kelly,* 625 F.2d at 490 (delay of 3 years 9 months in processing disability application worked denial of due process) *with Loudermill,* 470 U.S. at 544–46 & n. 12, 105 S.Ct. at 1495 & n. 12 (9 month delay in provision of hearing did not work denial of due process); *Mathews v. Eldridge,* 424 U.S. 319, 342, 96 S.Ct. 893, 906, 47 L.Ed.2d 18 (1976) (eleven month delay in adjudicating post-termination appeal of denial of disability benefits does not violate due process, where disability recipient may seek other sources of support); *Isaacs,* 865 F.2d at 477 (19 month delay in adjudication of

medical benefits appeal did not work denial of due process, because such a delay is not remarkable in the employment benefits system); *Ritter v. Cohen*, 797 F.2d 119, 124 (3d Cir.1986) (allegation of 20 month delay by agency did not state constitutional violation); *Givens*, 720 F.2d at 201 (19 month delay in adjudicating appeal of railroad benefits denial did not work denial of due process, where no evidence of intentional delay offered); *Frock v. United States Railroad Retirement Bd.*, 685 F.2d 1041, 1047 (7th Cir.1982) (two year delay in adjudicating appeal did not work denial of due process), *cert. denied*, 459 U.S. 1201, 103 S.Ct. 1185, 75 L.Ed.2d 432 (1983).

■ The Civil Service system has failed to provide timely post-deprivation procedures. However, as *Loudermill* points out, the court cannot evaluate the adequacy of the procedural safeguards under the due process clause without looking at both the pre- and post-deprivation procedural remedies. The need for post-deprivation remedies diminishes when the pre-deprivation procedures are ample. Here, Cronin had *two* full blown pre-deprivation hearings in which both Koelsch and Foundas found Cronin had lied under oath about his authorship of the letter. In these circumstances, the delay has not been so great as to render the post-deprivation remedy inadequate.

### 5. *Qualified Immunity*

■ In any event, Koelsch asserts the defense of qualified immunity. The qualified immunity inquiry in this context is a familiar one:

> Qualified immunity shields government official performing discretionary functions from civil damages "insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." On a motion for summary judgment, "the relevant question is whether a reasonable official could have believed his actions were lawful in light of clearly established law

and the information the official possessed at the time of his allegedly unlawful conduct.

*Febus–Rodríguez v. Betancourt–Lebrón*, 14 F.3d 87, 91 (1st Cir.1994) (citations omitted). Qualified immunity protects "all but the plainly incompetent or those who knowingly violate the law" or those who act where "the law clearly proscribed the actions" taken. *Anderson v. Creighton*, 483 U.S. 635, 638–39, 107 S.Ct. 3034, 3038, 97 L.Ed.2d 523 (1987). "Since a reasonable public official is expected to know the law, our inquiry is nothing more than an examination whether the events [at issue] violated 'clearly established constitutional rights.'"[5] *Hall v. Ochs*, 817 F.2d 920, 924 (1st Cir.1987) (citation omitted).

■ Cronin does not point to any clearly established constitutional rights which Koelsch violated. The decision to terminate Cronin was objective and reasonable in light of the substantial evidence before him that the handwriting in the pornographic letter was Cronin's, and Cronin had lied about it under oath. Plaintiff argues that there are disputed issues of fact as to whether Cronin in fact wrote the letter, whether Wright is credible in his assertion that he found the letter in the desk, and whether the "cartel", as he refers to defendant police officers, defamed him because of ulterior motives stemming from employment and union disagreements. However, these disputed issues of fact are not material. Even assuming all these allegations to be true, there is no evidence that the town manager or the Board of Selectmen had reason to disbelieve the corroborated statements of at least four police officers, buttressed by a handwriting expert.

### D. *The Right to Petition*

■ Cronin's right to petition the government, plaintiffs suggest, was infringed when his early 1993 complaints, principally concerning an alleged death threat by defendant officer Leary, evoked no action from defendant McAdams (then acting Chief of the department), from Manager Koelsch, or

---

**5.** Because there is no evidence that the members of the Board of Selectmen made the decision to terminate Cronin, the court need not rule on their defense of qualified immunity. However, even if there were sufficient evidence to draw the inference that Koelsch was a "puppet" of the Board of Selectmen, the Board would have the same valid claim of immunity.

from a clerk-magistrate of the Newburyport District Court. However, Cronin's claims were investigated by Officer Cleary at the request of Acting Chief McAdams, and that was constitutionally sufficient. Leary was formally reprimanded on a related charge. The "right to petition government afforded by the First Amendment does not include the absolute right to speak in person to officials. Where written communications are considered by government officials, denial of a hearing does not infringe upon the right to petition. The right to petition government does not create in the government a corresponding duty to act." *Stengel v. Columbus,* 737 F.Supp. 1457, 1459 (S.D.Ohio 1988) (citations omitted).

### E. *The right of confrontation*

■ The right to confront witnesses is not an independent constitutional right except in criminal proceedings. *See* U.S. Const.Amend. VI ("In all criminal prosecutions, the accused shall enjoy the right ... to be confronted with the witnesses against him."); *Perez v. United States,* 850 F.Supp. 1354, 1366–67 (N.D.Ill.1994) (collecting cases). To the extent that plaintiffs are arguing that confrontation of witnesses was part of the process that was due before Cronin could be deprived of his property right, this argument collapses into the dispute over whether Cronin's termination violated the procedural due process clause. The court need not address plaintiff's claim that the defendants violated his right to confront witnesses under Article XII of the Massachusetts Declaration of Rights. See, e.g., *Murphy v. Supt. Mass. Correctional Inst.,* 396 Mass. 830, 832, 489 N.E.2d 661 (1986). However, even if there were such a right, Cronin had the opportunity to confront his accusers at the hearings before Koelsch and Foundas.

### F. *The right to privacy*

■ Plaintiff claims defendants violated his privacy interests by taking a private letter from his desk without authority and by disseminating it. As plaintiff concedes, he cannot claim a right to privacy in a document of which he denies authorship under oath.

Accordingly, plaintiff presses this argument only as an alternative theory of recovery.

### 1. *The Purloined Letter*

Defendants object that Cronin could have no reasonable expectation of privacy in his desk drawer. *See Katz v. United States,* 389 U.S. 347, 351, 88 S.Ct. 507, 511, 19 L.Ed.2d 576 (1967) ("What a person knowingly exposes to the public, even in his own home or office is not a subject of Fourth Amendment protection."). In the instant context, the governing analysis is elaborated by *O'Connor v. Ortega,* 480 U.S. 709, 107 S.Ct. 1492, 94 L.Ed.2d 714 (1987).

> Individuals do not lose Fourth Amendment rights merely because they work for the government instead of a private employer.... [However, public employees' expectations of privacy in their offices, desks, and file cabinets, like similar expectations of employees in the private sector, may be reduced by virtue of actual office practices and procedures, or by legitimate regulation.... The employee's expectation of privacy must be assessed in the context of the employment relation. An office is seldom a private enclave free from entry by supervisors, other employees, and business and personal invitees. Instead, in many cases offices are continually entered by fellow employees and other visitors during the workday for conferences, consultations, and other work-related visits. Simply put, it is the nature of government offices that others—such as fellow employees, supervisors, consensual visitors, and the general public—may have frequent access to an individual's office.

*Id.,* 480 U.S. at 717, 107 S.Ct. at 1497. Under this analysis, defendants have introduced uncontradicted evidence that as the union treasurer, Officer Wright reasonably believed that he could go into Chief Cronin's drawer to get petty cash to send flowers to the fire chief in sympathy for his mother's death. However, authority to obtain access to the chief's desk for purposes of finding petty cash is not the same as authority to read private correspondence in the desk, to take the letter out of the desk, or to disseminate it. There is at least a question of material

disputed fact as to whether the chief had a reasonable expectation of privacy in the contents of the letter.

■ While defendant police officer Wright's initial reading of the letter raises a cognizable claim of invasion of privacy under state law—as does Cleary's disclosure to Valli so they could go to the theater together—there is no evidence that these police officers were acting under color of law. The First Circuit has very recently addressed the subject of the "color of state law" requirement:

> [T]he construct—'acting under color of state law'—rarely depends on any single, easily determinable fact, such as a policeman's garb, duty status, or whereabouts.... In general, section 1983 is not implicated unless a state actor's conduct occurs in the course of performing an actual or apparent duty of his office, or unless the conduct is such that the actor could not have behaved in that way but for the authority of his office. Thus, whether a police officer is acting under color of state law turns on the nature and circumstances of that conduct to the performance of his official duties.

*Martinez v. Colon*, 54 F.3d 980, 986 (1st Cir.1995) (citations omitted); *see also Mark v. Borough of Hatboro*, 51 F.3d 1137, 1151 (3d Cir.1995) ("acts committed by a police officer ... while on duty and in uniform are not under color of state law unless they are in some way 'related to the performance of police duties.' ") (citations omitted). Under this analysis, defendant police officers would not be liable under any section 1983 claim based upon their supposed retrieval and dissemination of the letter as there is no evidence that their conduct was under color of law.

■ There is evidence that defendant police officers disclosed the letter to the Selectmen and Dr. Barry under color of law. There is no viable procedural due process claim as state common law and statutory causes of action for invasion of privacy provide an adequate remedy. In any event, as there is sharply divided caselaw on the authority of a municipality to inquire into a police officer's private sexual conduct and its impact on fitness for duty, the police officers'

limited dissemination of the letter is protected under the doctrine of qualified immunity.

### 2. *Public Dissemination*

■ Plaintiff challenges the public disclosure of the letter in August, 1992 after the two public hearings of the Board of Selectmen. Defendants respond that "interests in privacy fade when the information involved already appears on the public record." *Cox Broadcasting Corp. v. Cohn*, 420 U.S. 469, 494–95, 95 S.Ct. 1029, 1046, 43 L.Ed.2d 328 (1975). The letter itself was an exhibit in the public record of the proceedings before hearing officer Foundas. Because Cronin had requested that the hearing be public, any claim that disclosure of the letter invaded his privacy rights is waived.

■ Moreover, as pointed out earlier, the right to privacy of a public employee is a limited one, and the contours of that right were not clearly established in 1992 or today. In the circumstances of this case, the court concludes that the town and the individual members of the Board of Selectmen did not abrogate plaintiff's clearly established privacy rights by public disclosure. At the time the letter was disclosed, a neutral hearing officer had concluded after a public hearing that Cronin had written it, and he had recommended discipline; the town manager had demoted him based in large part on a finding he had lied about his discussions concerning the letter. Gonthier testified that the Board of Selectmen released the letter to the press after a Freedom of Information Act request for the letter, which had been an exhibit at the Foundas hearing. The selectmen could fairly have concluded that the public interest in disclosing the basis for the discipline of the town police chief outweighed his privacy interests. As the First Circuit has warned, "[w]hen the law requires a balancing of competing interests, it may be unfair to charge an official with knowledge of the law in the absence of a previously decided case with clearly analogous facts." *Borucki v. Ryan*, 827 F.2d 836, 848 (1st Cir.1987) (district attorney had qualified immunity where he disclosed private psychological information because he concluded public confidence would be furthered).

### G. Section 1985

■ The "invidiously discriminatory animus requirement" of section 1985(3) requires that a defendant have taken action at least in part because of "its adverse effects upon an identifiable group." *Bray v. Alexandria Women's Health Clinic,* — U.S. —, — – —, 113 S.Ct. 753, 759–63, 122 L.Ed.2d 34 (1993); *accord Oropallo v. Parrish,* 23 F.3d 394, 1994 WL 168519, at n. 5 (1st Cir.1994). No such allegation is made concerning any defendant.

### H. State Claims

There being no other federal claims, this court exercises its prerogative under 28 U.S.C. § 1367, to dismiss all pendent state claims, without prejudice, for lack of jurisdiction. *See, e.g., Mercado–Garcia v. Ponce Federal Bank,* 979 F.2d 890, 896 (1st Cir. 1992).

### ORDER

For the foregoing reasons, defendants' motion for summary judgment (Docket # 154) on Counts I, II and XV is ***ALLOWED.*** The remaining claims under state law are dismissed without prejudice.