ESTATE OF Leroy E. HAMPTON, Jr., Plaintiff

v.

ANDROSCOGGIN COUNTY, et. al., Defendants

No. CIV. 02–127–PH.

United States District Court, D. Maine.

Jan. 9, 2003.

Edward Rabasco, Jr., Esq., Gosselin, Dubord & Rabasco P.A., Lewiston, ME, for Plaintiff.

Michael J. Schmidt, Esq., Wheeler & Arey, P.A., Waterville, ME, for Defendants.

## ORDER AFFIRMING RECOMMENDED DECISION OF THE MAGISTRATE JUDGE

HORNBY, District Judge.

The United States Magistrate Judge filed with the court on December 11, 2002, with copies to counsel, his Recommended Decision on Defendant's Motion for Summary Judgment. The plaintiff filed an objection to the Recommended Decision on December 11, 2002. I have reviewed and considered the Recommended Decision, together with the entire record; I have made a *de novo* determination of all matters adjudicated by the Recommended Decision; and I concur with the recommendations of the United States Magistrate Judge for the reasons set forth in his Recommended Decision, and determine that no further proceeding is necessary.

It is therefore ORDERED that the Recommended Decision of the Magistrate Judge is hereby ADOPTED. The defendants' motion for summary judgment is GRANTED.

So ORDERED.

## RECOMMENDED DECISION ON DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

DAVID M. COHEN, United States Magistrate Judge.

Defendants Androscoggin County ("County"), Androscoggin County Sheriff Ronald Gagnon and Androscoggin County Sheriff's Department ("Department") (collectively, "Defendants") move for summary judgment as to all claims against them in this action arising from the death of Androscoggin County Jail ("Jail") inmate Leroy E. Hampton, Jr. on May 23, 2000. Defendants['] Motion for Summary Judgment, etc. ("Motion") (Docket No. 5) at 1–2, 8. For the reasons that follow, I recommend that the Motion be granted.

## I. Summary Judgment Standards

Summary judgment is appropriate only if the record shows "that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). "In this regard, 'material' means that a contested fact has the potential to change the outcome of the suit under the governing law if the dispute over it is resolved favorably to the nonmovant. By like token, 'genuine' means that 'the evidence about the fact is such that a reasonable jury could resolve the point in favor of the nonmoving party.'" *Navarro v. Pfizer Corp.*, 261 F.3d 90, 93–94 (1st Cir.2001) (quoting *McCarthy v. Northwest Airlines, Inc.*, 56 F.3d 313, 315 (1st Cir.1995)).

The party moving for summary judgment must demonstrate an absence of evidence to support the nonmoving party's case. *Celotex Corp. v. Catrett*, 477 U.S. 317, 325, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). In determining whether this burden is met, the court must view the record in the light most favorable to the nonmoving party and give that party the benefit of all reasonable inferences in its favor. *Nicolo v. Philip Morris, Inc.*, 201 F.3d 29, 33 (1st Cir.2000). Once the moving party has made a preliminary showing that no genuine issue of material fact exists, the nonmovant must "produce specific facts, in suitable evidentiary form, to establish the presence of a trialworthy issue." *Triangle Trading Co. v. Robroy Indus., Inc.*, 200 F.3d 1, 2 (1st Cir.1999) (citation and inter-

nal punctuation omitted); Fed.R.Civ.P. 56(e). "As to any essential factual element of its claim on which the nonmovant would bear the burden of proof at trial, its failure to come forward with sufficient evidence to generate a trialworthy issue warrants summary judgment to the moving party." *In re Spigel,* 260 F.3d 27, 31 (1st Cir.2001) (citation and internal punctuation omitted).

## II. Factual Context

### A. Defendants' Facts

As the Defendants observe, the plaintiff Estate of Leroy E. Hampton, Jr. ("Estate") fails to respond to (*i.e.,* admit, deny or qualify) their material facts as required by Local Rule 56(c), although it does submit a separate statement of additional facts. *See* Defendants Androscoggin County, Ronald Gagnon and Androscoggin County Sheriff's Department's Reply Memorandum to Plaintiff's Objections to Defendants' Motion for Summary Judgment ("Reply") (Docket No. 14) at 2; Plaintiff's Statement of Material Facts ("Plaintiff's SMF") (Docket No. 12). Accordingly, per Local Rule 56(e), the Defendants' statements are deemed admitted to the extent properly supported by the record citations given. The Defendants' cognizable facts follow.[1]

At approximately 3:21 p.m. on May 22, 2000 Hampton was brought to the Jail. Defendants' Statement of Material Facts ("Defendants' SMF") (Docket No. 6) ¶ 1; Affidavit of John Lebel ("Lebel Aff."), attached thereto, ¶ 3. At approximately 3:49 p.m. that day, corrections officer Jason Landry conducted Hampton's booking in-

terview. Defendants' SMF ¶ 2; Affidavit of Jason Landry ("Landry Aff."), attached thereto, ¶ 2. During that interview Hampton denied that he (i) suffered from any disability, (ii) required any other form of assistance or (iii) was taking any medication at that time. Defendants' SMF ¶¶ 3–4; Landry Aff. ¶¶ 3–4. Hampton did tell the booking officer that he had a heart condition, which he described as a "heart murmur," and that he had high blood pressure. Defendants' SMF ¶ 5; Landry Aff. ¶ 5.

Hampton had also informed Jail personnel on March 23, 2000, when he previously had been incarcerated at the Jail, that he had a heart murmur and high blood pressure. Defendants' SMF ¶ 6; Androscoggin Sheriff Department Medical Screening Sheet dated March 23, 2000 ("3/23/00 Screening Sheet"), attached as Exh. 2 thereto, at 1. Hampton did not indicate during intake screening interviews on March 23, 2000 or on May 22, 2000 that he was in need of medical care or treatment. Defendants' SMF ¶ 7; Androscoggin Sheriff Department Medical Screening Sheet dated May 22, 2000, attached as Exh. 1 thereto, at 4; 3/23/00 Screening Sheet at 4.

Following the intake screening on May 22, 2000 Hampton was classified as maximum security and assigned to Cell Block A, cell A–6. Defendants' SMF ¶ 8; Lebel Aff. ¶ 3.[2] Most of the inmates in Cell Block A, including Hampton, came out of their cells on May 23, 2000 to have breakfast. Defendants' SMF ¶ 10; Affidavit of Richard Adams ("Adams Aff."), attached thereto, ¶¶ 2–3. All of them, including

---

**1.** Portions of the Defendants' statements that are not supported by the citations given are not credited.

**2.** The Defendants' additional statement that "Hampton spent the night of May 22, 2000 in the Androscoggin County Jail without incident, and did not make any requests for medi-

cal treatment," Defendants' SMF ¶ 9, is an overly sweeping characterization of affiant Lebel's cited statement that "[t]here are no inmate medical request forms indicating that Leroy Hampton sought medical attention either on May 22, 2000 or May 23, 2000," Lebel Aff. ¶ 7.

Hampton, returned to their cells at approximately 7:05 a.m. on May 23, 2000. Defendants' SMF ¶ 11; Adams Aff. ¶ 4. Hampton did not indicate to corrections officer Richard Adams verbally, nor did Adams observe, that Hampton was in need of medical attention between 6:55 and 7:10 a.m. on May 23, 2000. Defendants' SMF ¶ 12; Adams Aff. ¶¶ 6–7. Hampton, who was observed every fifteen minutes thereafter, did not indicate verbally that he was in need of medical attention or appear to need any. Defendants' SMF ¶¶ 13–14; Affidavit of Donald Olivier, attached thereto, ¶¶ 2–4.

At approximately 9:40 a.m. on May 23, 2000 corrections officer Patricia Morse entered Cell Block A and was in the process of going to each cell asking the inmates if they wished to go to the recreation room. Defendants' SMF ¶ 15; Affidavit of Patricia Morse ("Morse Aff."), attached thereto, ¶ 5. When she got to Hampton's cell, she called to him and did not get a response. Defendants' SMF ¶ 15; Morse Aff. ¶ 6. After calling to Hampton a second time and receiving no response, she entered the cell and found him lying on his back. *Id.* She nudged Hampton and, upon receiving no response, lifted his blanket to check for respiration. Defendants' SMF ¶ 15; Morse Aff. ¶ 7. A "Code Blue" was issued. Defendants' SMF ¶ 15; Morse Aff. ¶ 8.

On the morning of May 23, 2000 physician's assistant Al Cichon was present and working at the Jail. Defendants' SMF ¶ 16; Affidavit of Al Cichon ("Cichon Aff."), attached thereto, ¶ 2. Cichon responded to the Code Blue and found corrections staff administering mouth-to-mouth ventilation to Hampton. Defendants' SMF ¶ 17; Cichon Aff. ¶¶ 3, 5. Cichon found a pulse by palpation and heard three heartbeats via stethoscope, but then the heartbeats stopped. Defendants' SMF ¶ 18; Cichon Aff. ¶ 6. Full CPR was started, and within approximately two minutes an airway was inserted and a resuscitation bag was used to ventilate Hampton. Defendants' SMF ¶ 19; Cichon Aff. ¶ 8. CPR was maintained continuously, with interruptions to check for heartbeat and spontaneous respiration. Defendants' SMF ¶ 20; Cichon Aff. ¶ 9. Oxygen was added to the resuscitation bag within approximately three to five minutes. Defendants' SMF ¶ 21; Cichon Aff. ¶ 10. A 911 call was made, and a rescue team arrived at the Jail within ten minutes. Defendants' SMF ¶ 22; Cichon Aff. ¶ 11. The paramedics who arrived assumed responsibility for the resuscitation, and Hampton was transferred by ambulance to St. Mary's Hospital. Defendants' SMF ¶ 23; Cichon Aff. ¶¶ 12–13. Hampton was pronounced dead at approximately 10:40 a.m. on May 23, 2000. Defendants' SMF ¶ 24; Cichon Aff. ¶ 14. An autopsy determined that his death was from natural causes, specifically toxic diffuse goiter. Defendants' SMF ¶ 25; Report of Office of Chief Medical Examiner, State of Maine, dated May 24, 2000, attached as Exh. 4 thereto, at 1.

Inmates entering the Jail are provided with an inmate handbook. Defendants' SMF ¶ 26; Lebel Aff. ¶ 5. The handbook advises inmates that if they need to see a health-care provider, they are to ask a corrections officer for a "Request for Medical Attention" form, fill out the inmate portion and give the form to a corrections officer. Defendants' SMF ¶ 27; Lebel Aff. ¶ 5.[3]

---

**3.** The Defendants' further statement that "Hampton did not fill out or submit an inmate 'Request for Medical Attention' form at any time on either May 22, 2000 or May 23, 2000, Defendants' SMF ¶ 28, is not supported by the citation given, *see* Lebel Aff. ¶ 7, and accordingly is not credited."

The Jail contracts with an outside health-care provider, Allied Resources for Correctional Health ("ARCH"), for medical services to be provided at the Jail. Defendants' SMF ¶ 29; Lebel Aff. ¶ 8. The Jail's policy is to provide confined offenders with unimpeded access to a full range of health programs as medically necessary. Defendants' SMF ¶ 30; Lebel Aff. ¶ 9. Medical staff are physically present at the Jail seven days a week during daytime hours and are on call twenty-four hours a day, seven days a week. Defendants' SMF ¶ 31; Lebel Aff. ¶ 10. In addition, the Jail's policy is to make emergency medical care available for an acute illness or unexpected health-care need that cannot be deferred until the next scheduled sick call. Defendants' SMF ¶ 32; Lebel Aff. ¶ 11. The medical policies set forth in the Jail's Policy and Procedure Manual comply with the mandates of the Maine Department of Corrections. Defendants' SMF ¶ 33; Lebel Aff. ¶ 12.

Androscoggin County is a member of the Maine County Commissioners Association Self–Funded Risk Management Pool ("MCCA"), and coverage is provided through a coverage document issued to each of the member counties. Defendants' SMF ¶ 34; Affidavit of Patricia Fournier ("Fournier Aff."), attached thereto, ¶ 2. The MCCA provided Androscoggin County with a separate member coverage certificate covering the period from January 1, 2000 through December 31, 2000. Defendants' SMF ¶ 34; Member Coverage Certificate ("Certificate"), attached as Exh. 6 thereto. This certificate includes affirmative language limiting the insurance-type coverage under the MCCA coverage document to those claims for which immunity is waived pursuant to the Maine Tort Claims Act. Id. Other than the insurance-type coverage provided to Androscoggin County under the MCCA's coverage document, Androscoggin County has procured no insurance against liability for any claim against the county or its employees for which immunity is not otherwise waived under the Maine Tort Claims Act. Defendants' SMF ¶ 35; Fournier Aff. ¶ 3.

## B. Plaintiff's Facts

The following facts set forth by the Estate are either (i) admitted or (ii) supported by the record citations given and admissible over any objection interposed by the Defendants.[4] I omit facts that merely duplicate those set forth above.

Patrick Scott Willigar and Curtis Snyder were incarcerated at the Jail on May 22–23, 2000. Plaintiff's SMF ¶ 6; Defendants' Reply SMF ¶ 6. The guard was stationed in the middle of the Jail's three cell blocks. Plaintiff's SMF ¶ 7; Affidavit of Patrick Scott Willigar ("Willigar Aff."), attached thereto as Exh. 1, ¶ 12. Although Willigar is uncertain whether he was in the Charlie or Bravo block, he is certain that Hampton was in one of the two blocks that he was not. Plaintiff's SMF ¶ 7; Willigar Aff. ¶¶ 11–12.[5] Snyder was in the PC unit,

---

**4.** The Defendants lodge a number of specific objections on the ground of immateriality. See generally Defendants' Response to Plaintiff's Statement of Additional Material Facts ("Defendants' Reply SMF") (Docket No. 15). Inasmuch as consideration of the statements in issue (i) proves not to be outcome-dispositive and (ii) affords a fuller hearing of the Estate's case, I overrule those objections.

**5.** The Defendants' objection to this statement on the ground of lack of competence, Defendants' Reply SMF ¶ 7, is overruled. Despite Willigar's shaky memory, I am unpersuaded that he lacked the capacity to perceive, or tell the truth concerning, his and Hampton's relative locations within the Jail's cell blocks. See, e.g., United States v. Davis, 261 F.3d 1, 38 n. 32 (1st Cir.2001) (" '[C]ompetency' generally refers to a witness's mental capacity to perceive events and comprehend the obligation to tell the truth[.]") (citations omitted). A further statement by the Estate that Hamp-

which he believes was cell block C. Plaintiff's SMF ¶ 8; Affidavit of Curtis E. Snyder ("Snyder Aff."), attached as Exh. 2 thereto, ¶ 6. Snyder was in the cell directly across from the door, *i.e.*, the second door into the cell block. *Id.* When Snyder looked out of his window he could see the officer's station, which was adjacent to the maximum-security block. *Id.* He could not see into the maximum-security area, although he could see the door. Plaintiff's SMF ¶ 8; Snyder Aff. ¶ 7.

Willigar could hear activity going on in the other cell blocks from his own when noises were loud. Plaintiff's SMF ¶ 9; Willigar Aff. ¶ 13. The guard station is just a few feet from each of the three cell blocks. Plaintiff's SMF ¶ 10; Defendants' Reply SMF ¶ 10. A fourth cell block meets up with the guard station. *Id.* When Willigar was incarcerated, the fourth cell block was empty. *Id.* The cell blocks themselves are spaced a few feet apart. *Id.* The doors are about fifteen to twenty feet from one another, perhaps even closer. *Id.* There were two or three other cells in the cell block between Willigar's block and the guard station. *Id.* ¶ 11. Two doors down from Willigar's cell was the door to exit the cell block, which is a few feet from the guard's station. *Id.*

Although Willigar did not know Hampton personally, he had seen him at the Jail.

Plaintiff's SMF ¶ 12; Willigar Aff. ¶ 16. He had also heard Hampton speak. *Id.*[6] Willigar knew Hampton to be an African American man, fairly built with typical African American hair. *Id.*[7] Willigar had heard Hampton speak prior to May 22, 2000. Plaintiff's SMF ¶ 13; Willigar Aff. ¶ 17.[8] When he was allowed out of his cell block, Willigar could see Hampton making a phone call. *Id.* Willigar is convinced that Hampton was in high max, the block immediately next to Willigar's, because Hampton was wearing orange and the inmates in that block were kept locked down. *Id.*

Snyder refers to Hampton as "Lucky" but also knew him as "Leroy" because that was what the guards called him. Plaintiff's SMF ¶ 14; Snyder Aff. ¶ 12. Snyder never talked to Hampton while he was incarcerated because they were in two separate units. Plaintiff's SMF ¶ 15; Defendants' Reply SMF ¶ 15. Nor did Snyder talk to Hampton prior to being incarcerated. *Id.* However, he knew of Hampton through mutual friends. Plaintiff's SMF ¶ 15; Snyder Aff. ¶ 13.

May 23, 2000 was Willigar's last day at the Jail. Plaintiff's SMF ¶ 16; Defendants' Reply SMF ¶ 16. Willigar was incarcerated for about thirty days total. *Id.* ¶ 17. He spent about two weeks in the cell he

ton "was in the cell that was adjacent to Mr. Willigar's cell," Plaintiff's SMF ¶ 7, is neither admitted nor supported by the citation given, which indicates that Willigar was in the cell block—not the cell—adjacent to Hampton's, *see* Willigar Aff. ¶ 12.

6. I note that the Defendants deny that Willigar is referencing Hampton or had heard Hampton speak, *see* Defendants' Reply SMF ¶ 12; however, for purposes of this motion I must construe the facts in the light most favorable to the Estate as non-movant.

7. The Defendants' objection to the following statements on the ground that they are based

on belief rather than the requisite personal knowledge, Defendants' Reply SMF ¶ 12, is sustained: "Mr. Willigar believes that there was only one African American man in the three cell blocks that surround the guard station. Mr. Willigar believes that the rest of the African Americans were in the cell blocks further down the corridor," Plaintiff's SMF ¶ 12.

8. The Defendants again deny that Willigar heard Hampton speak, Defendants' Reply SMF ¶ 13; again, I construe the facts in the light most favorable to the Estate.

occupied between May 22–23, 2000. *Id.* On the last night of his stay at the Jail, Willigar heard yelling and a lot of very loud banging. Plaintiff's SMF ¶ 18; Willigar Aff. ¶ 20.[9] Willigar went to the door a couple of times to find out what was going on because the noise was preventing him from sleeping. *Id.* Willigar could hear someone yelling that he needed a doctor. Plaintiff's SMF ¶ 19; Willigar Aff. ¶ 20. At times he heard, "I need a doctor. Please get me a doctor." *Id.* Alternatively, he would hear cursing and swearing, like someone was giving out orders to get him a doctor immediately. *Id.* Willigar heard a guard yelling to someone to sit down and shut up and put in a medical request. Plaintiff's SMF ¶ 20; Willigar Aff. ¶ 20. He heard someone say that a medical request had already been filed. *Id.* This dialogue was repeated several times. *Id.* Willigar heard someone plead for a doctor because it was an emergency. *Id.* He could also hear the guard say that there was no doctor until the next day. *Id.*

On May 22, 2000, late at night, Snyder heard someone asking repeatedly to see a nurse. Plaintiff's SMF ¶ 21; Snyder Aff. ¶ 8.[10] He would look out of his window, get up out of bed and look out of the window again. *Id.* Snyder could see the guard's station. *Id.* He observed the guard go through the maximum-security door but did not hear any of the individual cell doors being opened. *Id.* He could hear the guard say to put in a request, and there would be a nurse the following morning. *Id.* Snyder was awake because he suffers from a sleeping disorder, and was reading a book when he heard the person calling out. Plaintiff's SMF ¶ 22; Snyder Aff. ¶ 10.

Willigar was able to hear clearly what was going on because the two parties were yelling through the cell blocks. Plaintiff's SMF ¶ 23; Willigar Aff. ¶ 20.[11] At first, the guard did not enter the cell block to talk to the other party. *Id.* Instead, the guard would stand outside the cell-block door. *Id.* There is a space between the cell door and the cell-block door. *Id.* Therefore, the two had to yell through both doors to be heard by each other. *Id.* The guard was aggravated and yelled at the man to sit down, shut up and go to sleep. *Id.* Eventually, the guard started to

**9.** The Defendants' objection to paragraphs 18–20 of the Plaintiff's SMF on the ground that Willigar neither identified Hampton as doing the banging and yelling nor is competent to do so, Defendants' Reply SMF ¶¶ 18–20, is overruled. Although Willigar does not, and cannot, positively identify Hampton as the inmate doing the yelling, the fact that he heard the yelling is material in the light of all of the circumstances. In the alternative, the Defendants deny these paragraphs to the extent they imply that Hampton was doing the yelling and banging, *id.;* however, I construe the facts in the light most favorable to the Estate.

**10.** The Defendants object, Defendants' Reply SMF ¶¶ 21–22, and I agree, that Snyder is not competent to testify that the inmate in question was Hampton. Snyder did not personally know Hampton, had not heard him speak and could not see the inmate whom he claims to have overheard on the night of May 22, 2000. Nor does Snyder explain how he drew the conclusion the inmate he heard was in fact Hampton. *See generally* Snyder Aff. Thus, references to the inmate as "Hampton" are stricken.

**11.** The Defendants object to paragraphs 23–25 of the Plaintiff's SMF on the basis that Willigar is not competent to identify the inmate who was speaking as Hampton, Defendants' Reply SMF ¶¶ 23–25; however, inasmuch as the statements in question do not identify the speaker as Hampton, the objection is overruled. The Defendants alternatively deny paragraphs 23 and 24 and that portion of paragraph 25 that implies that the unidentified man was Hampton, *see id.;* however, I construe the facts in the light most favorable to the Estate.

enter the cell block in order to talk to the man. Plaintiff's SMF ¶ 24; Willigar Aff. ¶ 20. The complaining would stop for a little while. *Id.* However, after ten or fifteen minutes the banging would start again. *Id.* It got to the point where only the banging could be heard, the guard would be seen entering the cell, the guard would come back out, the banging having stopped, and within ten minutes the banging would start again. *Id.* Finally there was a lot of banging. Plaintiff's SMF ¶ 25; Willigar Aff. ¶ 20. The door to the cell block could be heard opening, and the guard was heard trying to reason with the man, who would start yelling. *Id.* Then the guard would leave the cell block and the banging would start again. *Id.* This went on for a while. *Id.* It was the middle of the night. *Id.*

During this incident Snyder was aware of Willigar and called out to him. Plaintiff's SMF ¶ 26; Snyder Aff. ¶ 11.[12] The individual who had been yelling sounded like an African American male because of the language/certain slang he used and the sound of his voice. Plaintiff's SMF ¶ 27; Willigar Aff. ¶ 22. For example, he would say, "Yo! Yo! I need a doctor now! Yo! You better get me a doctor now!" and "Get the fuckin' doctor here!" *Id.*[13] There was only one African American man in that

particular area. Plaintiff's SMF ¶ 28; Willigar Aff. ¶ 23.

The guard who stood watch on the evening of May 22–23, 2000 had a New York or New Jersey accent. Plaintiff's SMF ¶ 35; Willigar Aff. ¶ 21. He appeared to be Italian. *Id.* He wore a gold cross around his neck and had a military kind of haircut. *Id.* The next morning he was still at the desk. *Id.* He was haggard-looking and was snappy with some of the inmates and was writing something. *Id.* Usually, his shift would have ended and he would have been gone by then. *Id.* Some kind of investigation was being conducted, and people in suits were taking pictures of a jail mattress and medical equipment on the floor. *Id.*

At the time of Willigar's incarceration, he was taking prescription Valium. Plaintiff's SMF ¶ 36; Willigar Aff. ¶ 28. Bart Marx, a mental health rehabilitation technician, helped Willigar get his prescription of Valium because the guards would not let him have his medication when he was first incarcerated. *Id.*[14] Willigar's physical well-being improved as a result of taking the Valium. Plaintiff's SMF ¶ 37; Willigar Aff. ¶ 29. Before he got the prescription he had a couple of crises at the Jail. *Id.* He put in an emergency medical request stating that he was very anxious and suicidal. *Id.* He waited for two days before anyone

**12.** The Estate's further statement that Snyder called out to Willigar "to find out if he could tell what was happening," Plaintiff's SMF ¶ 26, is neither admitted nor supported by the citation given, *see* Snyder Aff. ¶ 11, and accordingly is disregarded. The Defendants deny the entirety of the statement to the extent it implies that Snyder and Willigar were attempting to communicate regarding Hampton, Defendants' Reply SMF ¶ 26; however, I construe it in the light most favorable to the Estate.

**13.** The Defendants object to paragraph 27 of the Plaintiff's SMF on the grounds of lack of personal knowledge (*e.g.*, use of the phrase,

"sounded like") or competence to testify. Defendants' Reply SMF ¶ 27. The objection is overruled. Willigar testifies that he overheard the voice in question and explains why, in his opinion, it sounded African–American.

**14.** The Defendants deny paragraph 36 of the Plaintiff's SMF to the extent it implies that corrections officers are responsible for providing inmates with medication. Defendants' SMF ¶ 36. Inasmuch as the Defendants submit uncontroverted evidence that corrections officers are not responsible for this task, this denial trumps any implication to the contrary by the Estate.

ever came to see him. *Id.* During that period, he tried cutting himself with a small staple. *Id.* It was only after the guards observed his cuts that a crisis worker was called. *Id.* He went a long time without any medication. *Id.* He was denied medical help at the Jail, and filed two grievances regarding medical care. *Id.*[15] Medications are provided to Jail inmates by the medical contractor, ARCH. Defendants'. Reply SMF ¶ 37; Lebel Aff. ¶ 8.[16]

## III. Analysis

The Estate's complaint sets forth three state-law claims stemming from Hampton's death—negligence (Count I), wrongful death (Count II) and respondeat superior (Count III). Complaint and Demand for Jury Trial ("Complaint"), attached to Notice of Removal (Docket No. 1), ¶¶ 6–21. It also contains a federal claim bottomed on 42 U.S.C. § 1983 (Count IV), on the basis of which the Defendants removed the instant action to this court from the Superior Court, Androscoggin County. *Id.* ¶¶ 22–24; Notice of Removal.

The Defendants contend, *inter alia,* that the Estate sets forth no basis on which

either the municipal entities or Gagnon individually can be held liable pursuant to section 1983. *See* .Motion at 7–14.[17] I agree. The Defendants also ask the court to exercise its supplemental jurisdiction to adjudicate the remaining state-law claims (rather than remanding them to state court) in the interest of "judicial economy." *Id.* at 2. Inasmuch as the Estate does not protest this exercise of jurisdiction, *see generally* Plaintiff's Response to Defendants' Motion for Summary Judgment, etc. ("Objection") (Docket No. 11), and the state-law issues are fully briefed, I recommend that the court reach them, finding the Defendants entitled to summary judgment as to those claims, as well.

## A. Federal Claim: Section 1983

A plaintiff alleging malfeasance of federal constitutional magnitude as a result of failure to render adequate medical care to an inmate must demonstrate that "the challenged official action constituted 'deliberate indifference' to a serious 'medical need.'" *McNally v. Prison Health Servs.,* 46 F.Supp.2d 49, 53 (D.Me.1999) (citations omitted).[18] "[A] prison official may be

---

15. The Defendants object to the Estate's further statement that "[t]here was no real medical help at the jail," Plaintiff's SMF ¶ 37, on the basis that Willigar is not shown to be competent to testify regarding any Jail medical situation other than his own, *see* Reply at 7. The objection is sustained. *See generally* Willigar Aff.

16. The affidavit of Paul R. Minton, M.D., to which the Defendants lodge an objection,˙ is not cognizable per Local Rule 56 in that the Estate does not refer to it in its statement of additional facts. *See* Reply at 2–3; Affidavit of Paul R. Minton, M.D. (Docket No. 13); Plaintiff's SMF.

17. The Defendants correctly observe that there effectively is only one municipal defendant, the County, of which the Department is a subdivision. *See* Motion at 7; 30–A M.R.S.A. §§ 401, 501, 1501; *Cronin v. Town of Amesbury,* 895 F.Supp. 375, 383 (D.Mass.

1995), *aff'd,* 81 F.3d 257 (1st Cir.1996) (entities that are integral part of town, such as police department, lack legal identity apart from town and therefore are not properly named as defendants in section 1983 suit).

18. It is unclear from the facts cognizable on summary judgment whether Hampton was serving a sentence (in which case his claim properly would be analyzed under the Eighth Amendment) or whether he was a pretrial detainee (in which case his claim would implicate Fourteenth Amendment due-process protections). *See, e.g., Gaudreault v. Municipality of Salem, Mass.,* 923 F.2d 203, 208 (1st Cir.1990). Nonetheless, the distinction is immaterial inasmuch as the First Circuit has applied the deliberate-indifference standard drawn from Eighth Amendment jurisprudence in denial-of-medical-care cases involving pretrial detainees. *See, e.g., id.; see also Mahan v. Plymouth County House of Corr.,* 64

held liable under the Eighth Amendment for denying humane conditions of confinement only if he knows that inmates face a substantial risk of serious harm and disregards that risk by failing to take reasonable measures to abate it." *Farmer v. Brennan*, 511 U.S. 825, 847, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994). The focus is on the defendant's subjective state of mind; "the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Id.* at 837, 114 S.Ct. 1970.

Viewing the cognizable facts in the light most favorable to the Estate, a trier of fact reasonably could infer that the man heard pounding, banging and pleading for medical attention at the Jail during the night of May 22–23, 2000 was Hampton. I assume *arguendo* that this disturbing scenario reflects deliberate indifference on the part of the guard then on duty. However, that guard is not a defendant in this case, and more is required to hold either the defendant municipality, or Sheriff Gagnon personally, liable pursuant to section 1983.[19]

"Municipal liability may be imposed under § 1983 when the enforcement of a municipal policy or custom was the moving force of a violation of federally protected rights." *Burrell v. Hampshire County*, 307 F.3d 1, 10 (1st Cir.2002). "The asserted policy must have been so well-settled and widespread that the policymaking officials of the municipality can be said to have either actual or constructive knowledge of it yet did nothing to end the practice." *Elliott v. Cheshire County*, 940 F.2d 7, 12 (1st Cir.1991) (citation and internal punctuation omitted).

The Estate identifies no official policy as a "direct causal link," *Burrell*, 307 F.3d at 10, to Hampton's death. *See generally* Objection. It argues instead that the Defendants' deliberate indifference to Hampton's medical needs "does not seem to be an isolated incident at the ... Jail. Mr. Willigar was also denied medication by the guards." *Id.* at 13. Nonetheless, one cannot reasonably infer from the Willigar incident that there was such a pervasive custom of indifference to inmate medical needs that Jail policymakers were, or should have been, aware on May 22–23, 2000 of the existence of a problem.

As an initial matter, it is not surprising that the guards themselves declined to give Willigar medication inasmuch as it was the responsibility of ARCH, rather than the guards, to render medical care at the Jail. Moreover, although Willigar did not receive medical attention until two days after he submitted an emergency medical form, he acknowledges that the guards did arrange for him to be seen after they observed that he had tried cutting himself with a small staple. In any event, there is no evidence that either the Willigar incident (or, for that matter, the Hampton incident itself) involved so many Jail staff as to reflect a widespread practice. *See, e.g., Willhauck v. Halpin*, 953 F.2d 689, 714 n. 25 (1st Cir.1991) ("While it is true that a single event alone cannot establish a municipal custom or policy ... where other evidence of the policy has been presented and the 'single incident' in question involves the concerted action of a large contingent of individual municipal employees, the event itself provides some

F.3d 14, 17 (1st Cir.1995) ("Eighth Amendment claims by pretrial detainees alleging denials of medical assistance essentially turn on whether the challenged official action constituted 'deliberate indifference' to a 'serious medical need.'").

**19.** The Estate clarified, in opposing summary judgment, that it does sue Gagnon in his individual capacity. *See* Objection at 14.

proof of the existence of the underlying policy or custom.") (citation and internal punctuation omitted).

■ The Estate falls short of generating a triable issue whether a widespread municipal policy or custom was the moving force behind Hampton's death. Hence, the County and the Department are entitled to summary judgment as to its section 1983 claim.

■ As to Gagnon, "[i]n an action brought under § 1983, supervisors are not automatically liable for the misconduct of those under their command. A plaintiff must show an affirmative link between the subordinate officer and the supervisor, whether through direct participation or through conduct that amounts to condonation or tacit authorization." *Carmona v. Toledo*, 215 F.3d 124, 132 (1st Cir.2000) (citation and internal quotation marks omitted); *see also, e.g., Figueroa–Torres v. Toledo–Davila*, 232 F.3d 270, 279 (1st Cir. 2000) ("A supervisor may be liable for the foreseeable consequences of offending conduct by subordinates if he would have known of it but for his deliberate indifference or willful blindness.") (citation and internal punctuation omitted). The Estate neither adduces evidence concerning Gagnon nor, as discussed above, succeeds in demonstrating the existence of a practice so widespread that Gagnon reasonably could be inferred either to have known of it or to have turned a willfully blind eye to it. No link between Gagnon and the events of May 22–23, 2000 having been forged, Gagnon is entitled to summary judgment on the Estate's section 1983 claim.

## B. State–Law Claims

To deflect the Estate's three state-law claims, the Defendants raise the shield of the Maine Tort Claims Act ("MTCA"), 14 M.R.S.A. § 8101 *et seq.* *See* Motion at 14–19.

Pursuant to the MTCA, "all governmental entities" are immune from suit on tort claims seeking recovery of damages unless an exception codified at 14 M.R.S.A. §§ 8104–A or 8116 pertains. *See* 14 M.R.S.A. §§ 8103(1), 8104–A & 8116; *Richards v. Town of Eliot*, 780 A.2d 281, 295 (Me.2001).[20] Section 8104–A, which concerns (i) ownership, maintenance or use of vehicles, (ii) construction, operation or maintenance of public buildings, (iii) discharge of pollutants and (iv) road construction, street cleaning or repair, is inapposite.

■ Section 8116 "provides that, to the extent a municipality has obtained insurance for tort claims against it, the municipality is liable to the limits of the insurance coverage." *Richards*, 780 A.2d at 295. "[T]he governmental entity against whom a claim is made bears the burden of establishing that it does not have insurance coverage for that claim." *Danforth v. Gottardi*, 667 A.2d 847, 848 (Me.1995). There is no dispute that the County has insurance coverage through the MCCA that includes affirmative language limiting coverage to those claims for which immunity is waived pursuant to the MTCA. It has no other relevant coverage. The Law Court has found disclaimer language similar to that contained in the County's MCCA policy "sufficient to avoid a waiver of immunity pursuant to section 8116." *City of Old Town v. Dimoulas*, 803 A.2d 1018, 1025 (Me.2002). This is dispositive of the section 8116 issue.

Inasmuch as the County and the Department succeed in demonstrating that

---

**20.** All three counts in issue, which assert causes of action for negligence, wrongful death and respondeat superior, seek recovery of damages. Complaint at 2–3.

the MTCA affords them immunity from suit as to the three tort claims in issue (Counts I, II and III of the Complaint), they are entitled to summary judgment as to those claims.

The Defendants' claim of statutory immunity for Gagnon implicates a different provision of the MTCA that affords absolute immunity from personal civil liability to employees of governmental entities for, among other things, "[p]erforming or failing to perform any discretionary function or duty, whether or not the discretion is abused[.]" 14 M.R.S.A. § 8111(C). The Law Court has devised a four-part test to help determine whether discretionary-function immunity shields a governmental employee from tort liability:

(1) Does the challenged act, omission, or decision *necessarily involve a basic governmental policy, program, or objective?*

(2) Is the questioned act, omission, or decision *essential to the realization or accomplishment of that policy, program, or objective* (as opposed to one that would not change the course or direction of the policy, program, or objective)?

(3) Does the act, omission, or decision *require the exercise of basic policy evaluation, judgment, and expertise* on the part of the governmental employee involved?

(4) Does the governmental employee involved *possess the requisite constitutional, statutory, or lawful authority and duty* to do or make the challenged act, omission, or decision?

*Carroll v. City of Portland,* 736 A.2d 279, 282–83 (Me.1999) (emphasis in original). The Estate concedes that the first three tests are met, but challenges the Defendants as to the fourth on the ground that they lacked authority to deny Hampton medical treatment in violation of his

Eighth Amendment rights. Objection at 13.

■ While the supervision of prison inmates has been held to constitute a discretionary task for purposes of the MTCA, *see Roberts v. State,* 731 A.2d 855, 857–58 (Me.1999), "egregious" abuse of discretion vitiates the protections of section 8111(C), *see, e.g., Comfort v. Town of Pittsfield,* 924 F.Supp. 1219, 1236 (D.Me.1996) (discretionary immunity is afforded police officers "except to the extent they act in a manner so egregious as to clearly exceed, as a matter of law, the scope of any discretion they could have possessed in their official capacity as police officers.") (citations and internal punctuation omitted) (construing the MTCA). The fly in the ointment for the Estate is (again) a lack of evidence from which a reasonable trier of fact could conclude that Gagnon—personally—egregiously abused the discretion afforded him. Gagnon accordingly is entitled to summary judgment as to the Estate's state-law claims.

## IV. Conclusion

For the foregoing reasons, I recommend that the court **GRANT** the Defendants' motion for summary judgment as to all claims against them.

### *NOTICE*

*A party may file objections to those specified portions of a magistrate judge's report or proposed findings or recommended decisions entered pursuant to 28 U.S.C. § 636(b)(1)(B) for which de novo review by the district court is sought, together with a supporting memorandum and request for oral argument before the district judge, if any is sought, within ten (10) days after being served with a copy thereof. A responsive memorandum and any request for oral argument*

*before the district judge shall be filed within ten (10) days after the filing of the objection.*

*Failure to file a timely objection shall constitute a waiver of the right to de novo review by the district court and to appeal the district court's order.*

December 11, 2002.